Donald RICHMOND, Plaintiff
and Appellant,

v.

Irvin NODLAND and Amanda Broer,
Defendants and Appellees.

Civ. No. 960104.

Supreme Court of North Dakota.

July 24, 1996.

Rehearing Denied Sept. 9, 1996.

Donald Richmond, Bismarck, pro se.

Steven A. Storslee, Curtis L. Wike, Fleck, Mather & Strutz, Bismarck, for defendants and appellees. Argued by Curtis L. Wike.

VANDE WALLE, Chief Justice.

Donald Richmond appealed from the district court's summary judgment dismissing his complaint for slander per se, the tort of outrage, and intentional infliction of emotional distress against the defendants, Irvin Nodland and Amanda Broer. We conclude that Nodland's and Broer's statements to the police were protected by qualified privilege and that Richmond did not offer evidence of malice. We affirm the district court's dismissal.

On September 14, 1993, Broer, a houseguest at Nodland's home, was babysitting Nodland's child when she saw a prowler in the backyard. She called Nodland at the restaurant where he was dining with his wife and told him about the prowler. Nodland alerted the Bismarck Police Department and went directly home.

By the time Nodland arrived home, the police were there investigating. Broer described the prowler as an older man with graying hair, wearing a light-colored t-shirt and jeans. Sometime during the investigation, the police were given Richmond's name as a possible suspect.[1] The police went to

---

1. Nodland and Richmond were familiar with each other. Nodland, an attorney, represented Richmond when Richmond was charged with arson in connection with a mobile home fire. After the criminal complaint was dismissed, Richmond filed a complaint against Nodland alleging fraud and deceit, legal malpractice, and breach of contract. *See Richmond v. Nodland*, 501 N.W.2d 759 (N.D.), *cert. denied*, 510 U.S. 869, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993) [affirming trial court's summary judgment dismissing Richmond's claims].

In his affidavit, Nodland explained that prior to September 14, 1993, Richmond "began to show up at trials that [he] would be participating in in both [s]tate and [f]ederal court. Richmond would usually show up in the front row on [Nodland's] side of the courtroom. Richmond would sit as close to [Nodland] as he was able to without coming inside the rail." During the same time frame, Nodland and his family had experienced "a number of intrusions, stalkings, and harassments by one or more persons." For ex-

ample, on one occasion, all of the deodorants and a dust buster had been removed from his home. The family also noticed that certain pots and pans were missing. On another occasion, the family left during the middle of the day to go shopping. Nodland stated that prior to shopping he closed a sliding patio door and inserted a wooden rod so that the door could not be opened from the outside, but when the family arrived home, the patio door was open and the wooden rod was in the middle of the room.

In her affidavit, Broer also described "several incidents which occurred at the Nodland home involving prowlers." For instance, about two weeks before the September 14th incident, Broer saw "an older man in and around the stairwell going to the laundry room on the lower level of the Nodland home." She went downstairs to ask the man whether she could help him. The man said that he was there to read a meter, but there was no meter in that area and the person did not have identification or any materials to record meter information.

Richmond's home to investigate and determined that Richmond was not the prowler.

 Summary judgment under Rule 56, N.D.R. Civ. P., is appropriate if, after "viewing the evidence in the light most favorable to the party opposing the motion and giving that party the benefit of all favorable inferences which can reasonably be drawn from the evidence, there is no genuine dispute as to either the material facts or the inferences to be drawn from undisputed facts, or if only a question of law is involved." *Rued Ins. v. Blackburn, Nickels & Smith,* 543 N.W.2d 770, 773 (N.D.1996); *American State Bank v. Sorenson,* 539 N.W.2d 59 (N.D.1995). Even when a factual dispute exists, if the law is such that the resolution of the factual dispute will not alter the result, the disputed facts are not material, and summary judgment is proper. *Knight v. North Dakota State Indus. Sch.,* 540 N.W.2d 387 (N.D.1995). When considering summary judgment, the court may examine the pleadings, depositions, admissions, affidavits, interrogatories, and inferences to be drawn from the evidence. *Kary v. Prudential Ins. Co. of America,* 541 N.W.2d 703 (N.D.1996).

Richmond asserted that Nodland and Broer defamed him by providing his name to the police during the investigation of the prowling incident. *See* NDCC § 14–02–04 (defining "civil slander" to include false and unprivileged publication other than libel which "[c]harges any person with crime...."). In dismissing Richmond's claims for defamation and emotional distress, the trial court concluded the communications were privileged, thus barring civil liability. We agree.

 The Legislature has made some communications privileged. NDCC § 14–02–05. There is no liability for defamatory statements that are privileged. *Rykowsky v. Dickinson Pub. Sch. Dist. 1,* 508 N.W.2d 348 (N.D.1993); *Soentgen v. Quain & Ramstad Clinic, P.C.,* 467 N.W.2d 73 (N.D.1991). " 'Privilege is based upon the sound public policy that some communications are so socially important that the full and unrestricted exchange of information requires some latitude for mistake.' " *Rykowsky,* 508 N.W.2d at 351 (quoting *Soentgen,* 467 N.W.2d at 78).

We have recognized that privilege is either absolute or qualified. A privilege is absolute when the free exchange of information is so important that even evidence of actual malice does not destroy the privilege. *See* NDCC §§ 14–02–05(1) [communication made in "the proper discharge of an official duty"]; 14–02–05(2) [communication made in "any legislative or judicial proceeding, or in any other proceeding authorized by law"]; *Soentgen,* 467 N.W.2d at 78; *Emo v. Milbank Mutual Ins. Co.,* 183 N.W.2d 508·(N.D.1971); *Farmers Educational & Coop. Union v. WDAY, Inc.,* 89 N.W.2d 102 (N.D.1958). A qualified privilege, on the other hand, "may be abused and does not provide absolute immunity from liability for defamation." *Soentgen,* 467 N.W.2d at 78; *see* NDCC § 14–02–05(3), (4). Whether privilege applies is a question of law for the courts. *Soentgen,* 467 N.W.2d at 78.

Nodland and Broer urge that under section 14–02–05(2), NDCC, their statements to the police were absolutely privileged as statements made during a "proceeding." Other jurisdictions have held that certain communications to law enforcement are absolutely privileged. *See, e.g., Williams v. Taylor,* 129 Cal.App.3d 745, 181 Cal.Rptr. 423, 428 (1982) [holding that a communication to police "concerning possible wrongdoing, made to an official governmental agency such as a local police department, and which communication is designed to prompt action by that entity, is as much a part of an 'official proceeding' as a communication made after an official investigation has commenced"]; *Layne v. Builders Plumbing Supply Co.,* 210 Ill.App.3d 966, 155 Ill.Dec. 493, 569 N.E.2d 1104 (1991) [communication for the investigation of a crime was of sufficient social interest to warrant absolute privilege]; *Correllas v. Viveiros,* 410 Mass. 314, 572 N.E.2d 7, 13 (1991) [applying absolute privilege rather than conditional privilege was appropriate when a criminal investigation was "well under way" when the defendant made her statements]; *see also* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 114, at 819–20 (5th ed.1984) [informal complaint should be observed as an initial step in a judicial proceeding]. We do not need to decide the absolute privilege issue, however, because the alleged-

ly defamatory communications are at least qualifiedly privileged. *See City of Fargo v. Ness,* 529 N.W.2d 572, 577 (N.D.1995) [stating that questions, "the answers to which are not necessary to the determination of an appeal, need not be considered"].

■ Section 14–02–05(3), provides a privilege for a communication made:

"without malice, to a person interested therein by one who also is interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information[.]"

*See Emo,* 183 N.W.2d at 514 [recognizing a qualified privileged communication as "usually a good faith communication wherein the author of the communication has an interest or duty which is public, personal, or private; either legal, judicial, political, moral, or social; and is made to a person having a corresponding duty or interest"]. Thus, in considering whether a defamatory statement is qualifiedly privileged, we undertake a two-step analysis: first, we determine whether "the attending circumstances of a communication occasion a qualified privilege," and if so, we determine whether the privilege was abused. *Soentgen,* 467 N.W.2d at 78.

■ In deciding whether Nodland's and Broer's statements to the police were an occasion of qualified privilege, we are persuaded that important public policy supports recognizing a qualified privilege for communications between citizens and law enforcement. In order for an investigation to be effective, there must be an open channel of communication between citizens and public officials. The channel would "quickly close if its use subjected the user to a risk of liability" for defamation. *Williams,* 181 Cal.Rptr. at 428. *See Fridovich v. Fridovich,* 598 So.2d 65 (Fla.1992) [comparing jurisdictions and concluding that a majority of the states embrace qualified privilege for communications to law enforcement]; *Brown v. P.N. Hirsch & Co. Stores, Inc.,* 661 S.W.2d 587 (Mo.App.1983) [stating the rule applied in a majority of states that a communication to law enforcement officers for the purpose of

bringing a criminal to justice is qualifiedly privileged]; *see generally* 50 Am.Jur.2d *Libel and Slander* § 293 (1995) [stating the general rule to be that "defamatory statements voluntarily made by private individuals ... to the police ... prior to the institution of criminal charges are presumptively qualifiedly privileged"]; Annotation, *Libel and Slander: Privilege Regarding Communications to Police or Other Officer Respecting Commission of Crime,* 140 A.L.R. 1466, 1471 (1942) [explaining that "the majority of the cases expressly dealing with this question hold that the privilege is qualified or conditional, not absolute"].

We agree with the observations of the Florida Supreme Court:

"[A] qualified privilege 'is sufficiently protective of [those] wishing to report events concerning crime and balances society's interest in detecting and prosecuting crime with a defendant's interest not to be falsely accused.' *Fridovich,* 573 So.2d at 70. There is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police. The countervailing harm caused by the malicious destruction of another's reputation by false accusation can have irreparable consequences."

*Fridovich,* 598 So.2d at 69 (footnote omitted). Citizens and law enforcement have a common interest in investigating criminal activity, and the discussion of potential suspects of criminal activity is relevant to that common interest. We conclude that defamatory statements voluntarily made to law enforcement during the investigation of criminal activity are qualifiedly privileged.

■ Having resolved that a qualified privilege exists, we next analyze whether Nodland and Broer abused the privilege. A qualified privilege is abused "if statements are made with actual malice, without reasonable grounds for believing them to be true, and on a subject matter irrelevant to the common interest or duty." *Soentgen,* 467 N.W.2d at 79. "Actual malice depends on scienter and requires proof that a statement was made with malice in fact, ill-will, or

wrongful motive." *Id.* For qualified privilege, actual malice is not inferred from the communication even if the statements are considered slander per se. *Id.*; N.D. Cent. Code § 14–02–05. Rather, it is the plaintiff's burden to prove actual malice. *Soentgen,* 467 N.W.2d at 79.

As a general matter, the determinations of actual malice and abuse of a qualified privilege are questions of fact. *Soentgen,* 467 N.W.2d at 79. But, when "the facts and inferences are such that reasonable minds could not differ, factual issues are questions of law." *Id.* In summary judgment proceedings, neither the trial court nor the appellate court has the duty or responsibility to search the record for evidence opposing the motion for summary judgment. *Timmerman Leasing, Inc. v. Christianson,* 525 N.W.2d 659 (N.D.1994). Aside from the communications, Richmond has offered no evidence to support his proposition that Nodland and Broer were involved in "a pre-planned hoax" against him. We are not persuaded that reasonable minds could conclude that the privilege was abused.

Richmond also contends that the district court erred in dismissing his tort claims for emotional distress. In *Rykowsky v.*

*Dickinson Public School Dist. 1,* 508 N.W.2d 348, 352 (N.D.1993), we rejected a similar argument:

> " 'A privilege which protected an individual from liability for defamation would be of little value if the individual were subject to liability under a different theory of tort.' We agree with the Delaware Supreme Court that 'the great weight of foreign precedent that an independent action for intentional infliction of emotional distress does not lie where, as here, the gravamen of the complaint sounds in defamation.' " [citations omitted]

Thus, Nodland and Broer were entitled to summary judgment dismissing Richmond's claims for emotional distress since the claims are barred by the privilege.

We affirm the summary judgment.

MESCHKE, MARING, NEUMANN and SANDSTROM, JJ., concur.