Ronald PETERSON, et
al., Respondents,

v.

BASF CORPORATION, a foreign
corporation, Appellant.

No. C3–02–857.

Court of Appeals of Minnesota.

March 11, 2003.

Douglas J. Nill, Douglas J. Nill Law Office; and Hugh V. Plunkett III, Michael Schwartz, Robert K. Shelquist, Yvonne M. Flaherty, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, for respondents.

James A. O'Neal, Bruce Jones, Faegre & Benson, LLP, Minneapolis, MN; and Kenneth F. Johannson, Johannson, Rust, Fagerlund, Yon & Stock, P.A., Crookston, MN; for appellant.

Lawrence S. Ebner, pro hac vice, McKenna Long & Aldridge LLP, Washington, DC, for amicus CropLife America.

Bruce M. Kleven, Minneapolis, MN, for amicus American Sugarbeet Growers Association.

Mike Hatch, Attorney General, Julie Ralston Aoki, Assistant Attorney General, St. Paul, MN, for amicus State of Minnesota.

Evan M. Tager, pro hac vice, Mayer, Brown, Rowe & Maw, Washington, DC, for amicus Chamber of Commerce of the United States.

Madge S. Thorsen, Kelly & Berens, P.A., Minneapolis, MN, for amicus Scholars of the AEI–Brookings Joint Center for Regulatory Studies.

Scott W. Johnson, Minneapolis, MN, for amicus National Association of Manufacturers and American Chemistry Council.

Wayne D. Struble, Bowman and Brooke LLP, Minneapolis, MN, for amicus Product Liability Advisory Council.

William F. Mohrman, Morhman & Kaardal, Minneapolis, MN, for amicus Washington Legal Foundation.

Considered and decided by HUDSON, Presiding Judge, SCHUMACHER, Judge, and G. BARRY ANDERSON, Judge.

## OPINION

HUDSON, Judge.

In this nationwide class action under the New Jersey Consumer Fraud Act, appellant BASF Corporation argues that: (a) it is entitled to judgment notwithstanding the verdict (JNOV) on the jury's determination that it engaged in consumer fraud; (b) it is entitled to JNOV on the verdict for damages as to the years 1992 and 1995–96; (c) it is entitled to a new trial based on errors in jury instructions and the improper admission of evidence; and (d) the district court improperly certified the class. Respondent farmers filed a notice of review challenging district court determinations as to prejudgment interest and moved to strike portions of BASF's brief. Eight amici filed briefs. We affirm and grant the motion to strike in part.

## FACTS

Respondents, farmers who purchased the herbicide Poast from New Jersey-based BASF Corporation from 1992 to 1996, brought a class action against BASF under the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. § 56:8–2 (West 2001). The action was based on the claim that BASF had defrauded thousands of American farmers by marketing its herbicide as two separate products, Poast and Poast Plus, for different uses at different prices through a "system of deceit." *Peterson v. BASF Corp.*, 618 N.W.2d 821, 824 (Minn.App.2000), *review denied* (Minn. Jan. 26, 2001).

Poast and Poast Plus are post-emergence grass herbicides that contain the same active ingredient, sethoxydim. Sethoxydim was invented, patented, and manufactured by Nippon Soda Company of Japan. Nippon licensed the molecule to BASF, which first used it to develop Poast.

BASF began the regulatory process to register Poast with the EPA in the late 1970s and early 1980s. The biggest hurdle to obtaining EPA registration was establishing the acceptable residue tolerance and determining whether the herbicide would leave a residue on the crops or pose a risk in food. BASF complied with these and other requirements and obtained EPA registration for Poast around 1982 for a large number of both major and minor crops.[1]

By 1983, BASF had registered Poast with the individual states, labeled it for use on major crops, and began marketing the product. It proved to be both safe and

---

1. "Major crops" such as soybeans, corn, and cotton are farmed on millions of acres of land but provide a relatively low financial return per acre. "Minor crops" include varied crops such as sugarbeets, vegetables, grapes, citrus fruits, and berries that are farmed on far fewer acres but bring farmers a much higher profit per acre.

highly effective in controlling weeds that were grasses. In contrast, earlier herbicides marketed for this purpose were not consistently effective, and the only other alternative, weeding by hand, was expensive. As word spread, both BASF and state agriculture departments received requests to use Poast on minor crops. BASF decided to enter the minor crop market and conducted additional efficacy and phytotoxicity testing. By about 1985, it began introducing the product into the minor crop market. Because the 1982 EPA registration already included these minor crops, BASF did not need to obtain any additional EPA approval, although it had to obtain state registrations and change the product label.

Meanwhile, BASF had been developing Poast Plus. When using Poast, the farmers had to add crop oil, an adjuvant, to the herbicide to ensure that it spread and penetrated the leaves properly. With Poast Plus, BASF included adjuvants in the solution sold to farmers. In 1992, BASF obtained EPA registration for Poast Plus for the same major and minor crops for which Poast was already registered. Because Poast and Poast Plus contain the same active ingredient—sethoxydim—and are applied at the same rate, the tolerances established for Poast applied to Poast Plus and no new residue testing was required. The Poast and Poast Plus labels registered with the EPA are identical and cover the same major and minor crops. BASF, however, obtained state registrations and labeled Poast Plus for use only on four major crops: soybeans, cotton, peanuts, and alfalfa. Further, it marketed Poast Plus at a lower price than Poast. Thus, minor-crop farmers could only purchase Poast at the higher price, while major-crop farmers could purchase Poast Plus at a lower price.

The farmers' lawsuit was based on the claim that in its marketing, BASF fraudulently concealed and omitted that the less expensive Poast Plus was registered with the EPA for use on the same minor crops as the more expensive Poast. The jury heard extensive testimony on the issue of whether Poast and Poast Plus were the same products or not. BASF introduced evidence that the products had different chemical formulas because they contained different inert ingredients and that they had different tank-mix capabilities. In addition, witnesses for BASF testified that Poast Plus was "hotter" than Poast, leading to the possibility of increased crop risk and risk of skin irritation. BASF also noted that Poast Plus is separately patented as a unique product, and that because of their chemical differences, the EPA required BASF to register the products separately and give them different names.

The farmers offered evidence that the products are the same: Poast and Poast Plus are EPA-registered for the same major and minor crops; Poast and Poast Plus are based on the same residue data; and Poast and Poast Plus contain the same active ingredient, sethoxydim. The products control the same weed grasses using the same number of applications, pounds of active ingredient per acre, and time of application. The farmers also asserted that BASF used deceptive formulations of the same product, in order to lead the farmers to believe that Poast was more expensive because it contained more sethoxydim, when the products were the same. They also produced testimony explaining or disputing BASF's claims as to the effect of the different inert ingredients and other distinctions between the products.

The jury also heard evidence as to the fraudulent acts and omissions of which the

farmers accused BASF. The farmers showed that BASF engaged in an advertising campaign claiming that only Poast was registered with the EPA for minor crops, despite the fact that Poast Plus was EPA-registered for the same minor crops. Other evidence showed that BASF used mailings to food processors and dealers, an article submitted to The Sugarbeet Grower magazine, and a position paper emphasizing the dangers of "off-label" use, despite the fact that Poast Plus had been approved for minor crops. In another strategy, BASF turned in its own dealers to the North Dakota agriculture inspectors for selling Poast Plus to minor-crop farmers in violation of state pesticide laws, leading to criminal prosecutions of dealers and farmers. Further, the farmers introduced evidence to show that BASF personnel lied to the North Dakota Pesticide Control Board to conceal the fact that Poast Plus was EPA-registered for the same crops as Poast. Once the board learned from EPA officials that this was merely a marketing strategy, North Dakota, as well as South Dakota, obtained so-called "rule 24(c)" special local needs registrations with the EPA, allowing their farmers to use Poast Plus on minor crops.

The jury returned a verdict finding that BASF violated the NJCFA and that the violations caused ascertainable losses to the farmers in the years 1992 to 1996. The jury awarded damages of $15,000,000. The district court trebled the damages and added prejudgment interest and attorney fees. After denial of posttrial motions, BASF appealed. Respondents filed a notice of review and filed motions to strike portions of BASF's brief with this court.

## ISSUES

I. Is BASF entitled to JNOV as to the jury determination that it violated the New Jersey Consumer Fraud Act?

II. Is BASF entitled to JNOV as to damages awarded for 1992 and 1995 to 1996?

III. Is BASF entitled to a new trial based on errors in jury instructions and improper admission of evidence?

IV. Did the district court improperly certify the class?

V. Were the damages readily ascertainable such that prejudgment interest should be awarded as of the date of their accrual and should prejudgment interest be awarded on the trebled damages?

## ANALYSIS

### I

BASF first contends that it is entitled to JNOV because as a matter of law it did not violate the New Jersey Consumer Fraud Act (NJCFA), N.J. Stat. Ann. 56:8–2 (West 2001). In addressing this claim, we are guided by the standard of review for an order denying JNOV as well as the law-of-the-case doctrine. First, an appellate court will review the evidence in the light most favorable to the verdict. *Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn.1998). If the verdict "can be sustained on any reasonable theory of the evidence" the denial of JNOV will be affirmed; it will be set aside only if "the evidence is practically conclusive against" it. *Id.* (citation and quotation omitted). The appellate court "may not weigh the evidence or judge the credibility of the witnesses." *Lamb v. Jordan,* 333 N.W.2d 852, 855 (Minn.1983) (citation omitted). The grant or denial of a motion for JNOV is a question of law reviewable de novo. *Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11, 14 (Minn.1979).

The second consideration addresses the fact that this court has already re-

solved certain issues in an earlier appeal from summary judgment. *Peterson v. BASF Corp.*, 618 N.W.2d 821 (Minn.App. 2000) (*Peterson I* ), *review denied* (Minn. Jan. 26, 2001). In such an instance, those issues become "the 'law of the case' and may not be relitigated in the trial court or re-examined in a second appeal." *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.*, 503 N.W.2d 793, 795 (Minn.App.1993) (citations omitted), *review denied* (Minn. Sept. 30, 1993). Issues not resolved in the first appeal may, of course, be considered in the second appeal. *Id.*

■ Finally, we note that we have considered arguments by amici. We note that an amicus may not raise an issue not addressed by the parties. *Country Joe, Inc. v. City of Eagan*, 560 N.W.2d 681, 687 n. 7 (Minn.1997). To the extent amici do so, we do not consider those arguments.

■ The NJCFA is aimed "at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate." *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 390 A.2d 566, 568 (1978) (quoted in *Peterson I*, 618 N.W.2d at 823). It was intended to "give New Jersey one of the strongest consumer protection laws in the nation." *Cox v. Sears Roebuck Co.*, 138 N.J. 2, 647 A.2d 454, 460 (1994) (quotation omitted). The law provides for a private cause of action and authorizes treble damages, attorney fees, and costs. N.J. Stat. Ann. 56:8–19 (West 2001). It is to be construed liberally in favor of the consumer. *Cox*, 647 A.2d at 461.

■ "The capacity to mislead is the prime ingredient of all types of consumer fraud." *Id.* at 462 (citation omitted). To show a violation of the act, there must be evidence that the person committed an unlawful practice within the meaning of the act. *Id.* There are three general categories of unlawful practices under the act, two of which are relevant here: affirmative acts and knowing omissions. *See id.* (describing the three categories as affirmative acts, knowing omissions, and regulation violations). Such practices may be unlawful "even if no person was in fact misled or deceived thereby." *Id.* (citations omitted); N.J. Stat. Ann. 56:8–2 (West 2001). Affirmative acts include "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation." N.J. Stat. Ann. 56:8–2. "[I]ntent is not an essential element [of such an affirmative act] and the plaintiff need not prove that the defendant intended to commit an unlawful act." *Cox*, 647 A.2d at 462 (citation omitted). Knowing omissions include "the knowing concealment, suppression, or omission of any material fact." N.J. Stat. Ann. 56:8–2. Intent is an essential element of this category, requiring proof that the defendant acted knowingly with intent that another rely on such concealment, suppression, or omission. N.J. Stat. Ann. 56:8–2; *Cox*, 647 A.2d at 462.

■ After showing that an unlawful practice occurred within the meaning of the act, the plaintiff must show that the unlawful consumer fraud caused an ascertainable loss. *Cox*, 647 A.2d at 464–65. Finally, the plaintiff must show that the loss was the result of the unlawful conduct. *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 541 A.2d 1063, 1067 (1988).

BASF contends it is entitled to JNOV on three grounds. First, it asserts that it did not violate the NJCFA as a matter of law because it has shown: that Poast and Poast Plus are not identical products; that

federal law preempts a private cause of action based on alleged abuse of the pesticide regulations; and that, in any event, it proceeded lawfully. Second, it contends that the farmers' theories of causation fail as a matter of law. Finally, it charges that the farmers failed to establish a causal link between BASF's allegedly unlawful acts and an ascertainable loss. We review these arguments under the very narrow standard of review for JNOV, and we consider as well whether this court has already ruled on these issues in *Peterson I*.

### New Jersey Consumer Fraud Act (NJCFA)

■ We first address BASF's claim that it is entitled to JNOV because as a matter of law it did not violate the NJCFA. It argues that it showed as a matter of law that Poast and Poast Plus are not "identical," citing, among other things, the different chemical formulas and patents of the two products. Consequently, it contends that the farmers' claim that it defrauded them by marketing one herbicide as two different products, Poast and Poast Plus, cannot stand. We must determine whether, under the standard for JNOV, the evidence *is conclusive against* the verdict or whether it can be sustained on any reasonable theory of the evidence. *See Pouliot*, 582 N.W.2d at 224.

The issue of whether Poast and Poast Plus were the same herbicide was hotly contested throughout the four-week trial and many witnesses, including farmers, BASF executives, experts, and others, testified on the topic. While BASF contends that the evidence shows conclusively that the products were not the same, testimony was introduced to explain or contradict BASF's evidence. For example, BASF contended that the products have different chemical formulas, ingredients, and con-

centrations of solvent. The farmers' witnesses explained that the products—although seeming to contain different amounts of sethoxydim—deliver the same amount of this active ingredient when applied according to directions. Witnesses also offered different opinions as to the effect of the inert ingredients. Further, the farmers cite the evidence that Poast and Poast Plus are approved by the EPA for the same crops, based on the same residue data. They control the same weed grasses, using the same number of applications, pounds of active ingredient per acre, and time of application.

The jury was presented with conflicting evidence as to whether the products were the same, and the jury was also presented with explanations as to why seeming differences were not significant. Although another fact-finder might have reached a different result, the jury clearly had evidence from which it could conclude that Poast and Poast Plus were the same product, and we will not substitute our judgment for that of the jury.

### Preemption

■ BASF next argues that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. 136a (2000), under which EPA registration is required, preempts private causes of action based on alleged abuse of pesticide regulations. It contends that, in any event, it proceeded legally under these provisions.

The farmers moved to strike this claim, contending that this court has already considered and rejected this argument in *Peterson I*. A careful reading of *Peterson I*, however, shows that this court did not explicitly address preemption; therefore, we will do so here. *Peterson I*, 618 N.W.2d at 824.

Pesticides are subject to federal regulation. 7 U.S.C. 136a(a). "[S]tate[s] shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required" by federal law. *Id.* 136v(b) (2000). Common-law tort actions have been interpreted to constitute such forbidden requirements. *Goeb v. Tharaldson,* 615 N.W.2d 800, 817 (Minn.2000). Consequently, federal courts "uniformly hold that FIFRA preempts claims relating to labeling and packaging of federally-registered pesticides." *Goeb,* 615 N.W.2d at 817 (citations omitted).

BASF cites several recent federal cases that it contends support its claims of preemption. *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 353, 121 S.Ct. 1012, 1020, 148 L.Ed.2d 854 (2001) (holding fraud-on-the-agency claims preempted); *Kimmel v. DowElanco,* 275 F.3d 1199, 1206 (9th Cir.2002) (holding that where allegations of fraud on the EPA and abuse-of-labeling process give rise to party's intentional-interference-with-prospective-business-advantage claim, claim is preempted); *Dahlman Farms, Inc. v. FMC Corp.,* 240 F.Supp.2d 1012 (D.Minn. 2002) (holding consumer-fraud claims based on label and off-label statements that were essentially the same were preempted).

In *Buckman,* the Supreme Court held that federal law preempts the state law claim where "the existence of these federal enactments is a critical element." 531 U.S. at 353, 121 S.Ct. at 1020. BASF contends that the farmers' regulator-abuse claims likewise make the federal regulations a "critical element." But in *Buckman,* the claims existed "solely by virtue of the FDCA disclosure requirements." *Id.* Here, the farmers' claims were based on BASF's misleading statements and omissions as to the EPA-authorized uses of the products, not on claims that BASF committed fraud in the labeling or packaging.

BASF's reliance on *Dahlman Farms* is similarly misplaced. There, Dahlman's corn crop was damaged after he applied defendant's herbicide pursuant to the label instructions and following assurances from the defendant's salesmen that the herbicide was safe for use on seed corn crops. *Id.* at 1014–15. Dahlman sued under Minnesota's consumer fraud statute claiming, among other things, that the defendant committed consumer fraud by making off-label statements in its advertising that misrepresented the efficacy of the product. *Id.* at 1020–21. The trial court held that Dahlman's claims were preempted because the off-label advertising statements concerning the efficacy of the product were essentially the same as the statements on the label itself—both indicated that the product was safe for use on seed corn crops. *Id.*

*Dahlman Farms* does not further BASF's cause. Again, the farmers here were not asserting that BASF's registration and container labels were false or misleading, which was the heart of the *Dahlman Farms* consumer fraud claim. Rather, the farmers' point was that *even if* BASF's labels were technically accurate, BASF could and did commit consumer fraud by leading farmers to believe that the cheaper Poast Plus could only be used on major crops, when, in fact, it was EPA-registered for both major and minor crops. Consequently, the farmers' claims are not preempted.

■ Next, BASF notes that federal regulations permit "subset labeling," that

is, labeling of a pesticide for fewer than all of the uses for which it is EPA-registered. Thus, BASF contends that its marketing of Poast and Poast Plus cannot be the basis for the jury's determination of fraud because it was proceeding lawfully under the federal regulations in registering Poast and Poast Plus as different products and in labeling Poast Plus for fewer than all of the crops for which it was registered with the EPA. The farmers move to strike this argument, contending that it was raised and decided by this court in *Peterson I.*

In *Peterson I,* this court specifically addressed the argument and noted that the farmers had presented evidence that the fraud was based not on BASF's lawful use of the regulations but on a plan that it designed "to conceal the fact that Poast Plus was EPA registered for use on minor crops and to discourage any off-label use of Poast Plus." 618 N.W.2d at 824. This court held that there was a genuine issue of material fact as to whether BASF's system of deceit fell within the protection of the NJCFA. *Id.* Thus, the issue has been resolved in the previous litigation and the farmers' motion to strike the argument is granted.

■ Further, to the extent that BASF challenges the sufficiency of the evidence on this issue, we hold that the jury could conclude that BASF's marketing scheme and exploitation of federal regulations, rather than its lawful use of federal regulations, concealed that Poast and Poast Plus were registered for the same uses and constituted fraud under the NJCFA.

**Causation**

■ The next issue concerns causation. "[A] causal relationship must exist between the ascertainable loss and the un-

lawful practice" to establish a violation under the NJCFA. *Roberts v. Cowgill,* 316 N.J.Super. 33, 719 A.2d 668, 672 (App.Div. 1998). "[O]nce a plaintiff has established a significant relationship" exists, the burden then shifts to the defendant to show that any particular losses do not have the requisite causal connection. *Id.* at 673. Even if the disputed commercial practice is not inherently deceptive, "[t]he statutory and regulatory scheme is also designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services." *Div. of Consumer Affairs v. Gen. Elec. Co.,* 244 N.J.Super. 349, 582 A.2d 831, 833 (App.Div.1990).

■ BASF asserts that the farmers' theory of causation cannot stand as a matter of law. In *Peterson I,* however, this court recognized the basis for the farmers' claim for damages:

[The farmers] claim that they lost the opportunity to refuse to buy Poast because BASF's marketing scheme and exploitation of federal regulations concealed that Poast Plus was registered for the same uses as Poast. [Farmers'] reactions when they learned of BASF's scheme constitute circumstantial evidence that these farmers would not have stood idly by and paid inflated fees to BASF.

618 N.W.2d at 825. The farmers contend that BASF's argument should be stricken because this court conclusively determined that whether BASF's actions arose to fraud under the NJCFA was a jury question. To the extent that BASF makes the legal argument again in this appeal, the argument is stricken.

■ BASF also contends that the evidence does not support the verdict as to

causation. The evidence will be viewed in the light most favorable to the verdict. *Pouliot,* 582 N.W.2d at 224. This court cannot set aside the verdict "if it can be sustained on any reasonable theory of evidence." *Id.* (citation omitted).

BASF contends that the farmers' argument that they were unfairly induced to buy Poast rather than Poast Plus must rest on their ability to force BASF to offer Poast Plus for minor crop use. It argues that as a matter of law it has the right to choose whether or not to market Poast Plus for minor crops. While BASF's argument may be true, this argument does not address the claim that BASF engaged in fraud.

■ Next, BASF contends that Poast Plus was not fully tested on minor crop use, citing testimony from its witnesses that Poast Plus had received only limited crop safety testing on minor crops. There was, however, extensive evidence from which the jury could conclude to the contrary. It was undisputed that when BASF registered Poast Plus with the EPA, no new residue testing data was required because Poast Plus, when applied according to directions, delivered the same amount of sethoxydim that Poast did. Further, the EPA required that companies seeking registration must complete efficacy and crop safety testing, although the companies are not required to submit the data to the EPA. Moreover, evidence showed that Poast Plus was used successfully on minor crops when permitted under North Dakota's and South Dakota's 24I registrations. There was also testimony by one of BASF's witnesses that the herbicide Vantage, an alternative name for Poast Plus, was labeled and marketed for use on fruit trees prior to development of fruit and ornamental and nursery plantings with only very limited testing. There was clearly evidence in the record from which the jury could have concluded that BASF believed Poast Plus had been sufficiently tested for use on minor crops.

Next, BASF asserts that because no state had approved Poast Plus for use on all 60 minor crops, it could not have legally marketed or sold Poast Plus for use on those crops, and farmers could not legally use it. It contends that each state requires its own crop-specific registration and approval of each pesticide before permitting sale or use within its borders. *See, e.g.,* Minn.Stat. 18B.26 (2002) (pesticide registration). BASF asserts that states apply different standards and may refuse to register pesticides for various crops regardless of the EPA registration. Consequently, it contends that the farmers sought to impose on BASF a duty to illegally promote and sell a pesticide for crops on which it could not legally be used.

Again, however, the farmers presented evidence from which the jury could reach a different conclusion. The farmers' expert testified that once a company obtains an EPA registration, it is "very easy" to obtain a state registration in the majority of the states. The process is generally regarded as a mere formality except in California, Wisconsin, New York, and Florida, unless the product is considered risky. Poast Plus is not considered risky. The expert explained that the states rely on the EPA label to ensure that the product has the proper residue tolerances, safety, and efficacy. For BASF to register Poast Plus for the additional minor crops in most states, he noted that it would merely have to include those crops on the EPA label, send a letter to the state departments of agriculture with a small fee, and ask that the additional crops be included on the state registration.

Next, BASF challenges the farmers' theory that, had the farmers known that Poast and Poast Plus had been registered with the EPA for the same uses, they would have been able to force BASF to lower the price of Poast to a fair price for minor crop use and "would not have stood idly by and paid inflated prices to BASF." BASF first contends that the farmers cannot force it to sell Poast at the price that they want. But this is not what the farmers contended. Instead, the issue here was whether such sales were based on fraud and thus were unlawful.

BASF also contends that the farmers are asserting that they have a right to engineer an illegal, concerted, horizontal boycott to drive down the price of Poast. *See F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (holding that where members of bar association agreed to stop representing indigent criminal defendants until government increased their compensation, this was a per se unlawful restraint of trade). But there was no evidence in this case of such an illegal "boycott." Instead, the evidence showed that the farmers discussed their individual decisions not to purchase BASF products.

BASF also contends that, assuming the "proposed boycott" was not illegal, New Jersey law does not support the farmers' "right to boycott" or "fraud on the market" theory. But the cases cited by appellant BASF are distinguishable. *See, e.g., Kaufman v. I–Stat Corp.*, 165 N.J. 94, 754 A.2d 1188, 1189 (2000) (addressing common-law fraud claim); *Jiries v. BP Oil*, 294 N.J.Super. 225, 682 A.2d 1241, 1243–44 (Law Div.1996) (holding plaintiff failed to show ascertainable loss).

▪ BASF next contends that the farmers failed to produce evidence to es-

tablish a causal link between BASF's conduct and an ascertainable loss. Again, the standard we must apply is whether the verdict can be sustained on any reasonable theory of evidence. *Pouliot*, 582 N.W.2d at 224.

In *Peterson I*, this court recognized that an ascertainable loss may be shown by the farmers' lost opportunity to refuse to purchase Poast due to BASF's fraud. 618 N.W.2d at 824–25. Here, the farmers assert they showed causation by evidence that they lost the opportunity to protest, petition for relief from governmental agencies, litigate, or simply make an intelligent, informed decision on whether to refuse to buy the more expensive Poast. They presented testimony from various witnesses, including the class representatives, that upon learning of BASF's fraudulent scheme, they engaged in or recommended just such activities. The jury again had evidence from which it could and did find causation. BASF has not shown that it has met the standards for JNOV.

## II

BASF next seeks JNOV on the jury's award of damages for the crop years 1992 and 1995–1996. As discussed above, the standard for JNOV is whether the verdict can be sustained on any reasonable theory of the evidence. *Pouliot*, 582 N.W.2d at 224.

▪ In awarding damages under the NJCFA, the goals of the act are two-fold. *Cox*, 647 A.2d at 463. First, the act "is clearly remedial in that it seeks to compensate a victim's loss." *Id.* Second, it serves as a deterrent, because it punishes the wrongdoer by awarding the victim treble damages, attorney fees, and costs. *Id.* "[I]n determining whether plaintiff has es-

tablished a loss under the Act, we are guided by but not bound to strict contract principles." *Id.* at 463–64.

■ BASF first argues that this court must reduce the portion of the damages attributed to the 1992 Poast sales because they are not supported by the evidence. The jury awarded $2,000,000, and, with treble damages and attorney fees, BASF asserts this amounts to $6,141,356.27.

BASF contends that even accepting the farmers' theory of damages, the record conclusively demonstrates that Poast Plus was not fully EPA-registered for use on minor crops until late October 1992, well after the annual crop season. Consequently, it asserts that no damages may be awarded for that year. It cites a February 18, 1992, EPA letter to BASF indicating that the registration was approved, but requiring submission of several more documents. The letter stated that if BASF did not comply with these conditions, the registration would be cancelled, but that release of the product for shipment constituted acceptance of the conditions.

The jury, however, had evidence to support its award of damages for 1992. First, the jury could have concluded that the product could be released for shipment before the final technical requirements were met. Second, the farmers' expert, who calculated damages, explicitly did not use the entire sales year for his 1992 calculation. Instead, he excluded sales of Poast for January through March because the EPA registration was received in February and it would then take several weeks to obtain approval from the states. The evidence in the record supported the jury's verdict, and the district court properly denied JNOV on this ground.

■ Next, BASF contends that it is entitled to partial JNOV as to the damages

award for the years 1995 and 1996. The jury awarded $4,000,000 damages for 1995 and $1,000,000 for 1996. BASF calculates that, after these amounts are trebled and prejudgment interest included, this amounts to $16,035,890.66, and BASF seeks reduction of the verdict by this amount.

BASF contends that the farmers cannot as a matter of law sustain their "lost opportunity" claim for 1995 and 1996, which rests on the assertion that BASF deprived them of the opportunity to refuse to buy Poast. It asserts that by May 1994, all of the information concerning EPA minor crop registration of Poast Plus was public knowledge and, by 1996, all of the plaintiffs had actually stopped buying Poast. BASF contends that as a matter of logic, they cannot claim to have suffered an ascertainable loss from a lost opportunity that they actually exploited, based on ignorance of facts they actually knew.

The farmers contend that they presented substantial evidence to the jury that BASF's unlawful conduct resulted in a broad-based, inflated price for the more expensive Poast herbicide resulting from mass consumer deception, exploitation, and "system of deceit." *See Peterson I,* 618 N.W.2d at 824. As discussed above, they asserted that this prevented farmers and state regulatory authorities from ascertaining the truth and consumers lost the opportunity to make informed purchasing decisions. They note that the jury was aware that in 1997, after BASF's scheme was uncovered and litigation commenced, BASF dropped the price of Poast nationwide to a price equivalent to Poast Plus.

The farmers' expert testified extensively as to the basis for his conclusion as to the damages the farmers suffered. He testified that the 1995 damages were

$6,440,647, BASF's expert testified they were $2,290,500, and the jury awarded $4,000,000. For 1996, the farmers' expert testified damages were $2,419,533, BASF's expert concluded they were just $550,220, and the jury awarded $1,000,000. The jury heard and considered all the evidence, and there was evidence to support its verdict; the district court did not err in denying JNOV as to damages occurring in 1995 and 1996.

## III

BASF contends that it is entitled to a new trial based on the trial court's failure to instruct the jury on numerous crucial elements of its defenses and on its improper admission of evidence.

### Jury Instructions

 The district court has broad latitude in selecting the language of jury instructions, as well as in determining the propriety of a specific instruction. *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986). Jury instructions will not be reversed absent an abuse of discretion. *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 (Minn. 2002). Where the instructions are overall a correct statement of the law, a new trial is not warranted. *Id.* Jury instructions will be reviewed as a whole. *Lindstrom v. Yellow Taxi Co. of Minneapolis*, 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974).

 The jury instruction charge need only "convey to the jury a clear and correct understanding of the law." *Cameron v. Evans*, 241 Minn. 200, 209, 62 N.W.2d 793, 798 (1954). "Usually it is preferable to give a general charge * * * upon the whole law of the case," rather than risk confusing the jury or emphasizing one side of the case by emphasizing particular items. *Id.* at 209, 62 N.W.2d at 799.

A party is entitled to a specific instruction on his theory of the case if there is evidence to support the instruction and it is in accordance with the applicable law.

*Cornfeldt v. Tongen*, 262 N.W.2d 684, 698 (Minn.1977) (citations omitted).

The district court instructions track virtually verbatim the New Jersey Supreme Court's model NJCFA jury instructions, taken from the New Jersey Model Civil Charges 4.23 (May 1998), http://www.judiciary.state.nj.us/charges/civil/423.htm (last modified Jan. 2001). The instructions describe and define the two relevant bases for liability under the act, affirmative acts and omissions, and address proximate cause and damages.

 BASF first contends that the instructions were deficient because they did not define materiality and did not advise the jury that the affirmative misrepresentation had to be material. BASF contends that a statement is material if "a reasonable person would attach importance to its existence in determining a choice of action." *Ji v. Palmer*, 333 N.J.Super. 451, 755 A.2d 1221, 1228 (App.Div.2000) (quotation omitted).

The court instructed the jury as follows:

A misrepresentation is an untrue statement, which is made about a fact, *which is important or significant to the sale or advertisement*, and it is communicated to another person to create the possibility that the other person will be misled.

(Emphasis added.) Similarly, the omission instruction refers to omission of "an important or significant fact." BASF has failed to show an abuse of discretion.

 Next, BASF challenges the verdict form. A district court has "broad

discretion in drafting special-verdict questions." *Russell v. Johnson*, 608 N.W.2d 895, 898 (Minn.App.2000) (citation omitted), *review denied* (Minn. June 27, 2000). While BASF acknowledges that the court instructed the jury that any actionable omission must relate to a material fact, it contends that the court committed a reversible error because the verdict form itself did not refer to "material fact." Instead, the verdict form asked:

> Did BASF engage in a knowing omission, suppression or concealment *of the truth in relation to* BASF's marketing and pricing strategies for Poast and Poast Plus?

(Emphasis added.)

First, BASF did not request a separate question on omission in the verdict form, although it did argue that if there were such a question it should refer to materiality. In any event, the materiality issue is encompassed by requiring the jury to find BASF engaged in omissions "in relation to" its marketing and pricing strategies; the jury was instructed as to materiality as well. Considering the instructions as a whole, the court "fairly and correctly stated the applicable law" and did not abuse its discretion. *See Russell*, 608 N.W.2d at 898 (stating this standard) (citation omitted).

▆▆▆▆ Next, BASF challenges the district court's failure to give multiple jury instructions relating to a variety of topics raised at trial. Generally, the trial court is not required to give a specific requested instruction unless it is necessary to allow the jury to intelligently decide the question. *Malik v. Johnson*, 300 Minn. 252, 258, 219 N.W.2d 631, 635 (1974). Applicable statutes and regulations that have the force of law may properly be read to the

jury. *Mikes v. Baumgartner*, 277 Minn. 423, 431, 152 N.W.2d 732, 738 (1967).

BASF's proposed instructions do not relate directly to the charge before the jury, which was whether BASF violated the NJCFA. Further, throughout the entire trial, the jury heard numerous discussions of these issues and the various witnesses' descriptions of the effect of the regulations. These topics were more properly the subject of counsel's final argument rather than jury instructions, and the court did not abuse its discretion in denying the request to include these instructions.

## Admissibility of evidence

▆▆▆▆ BASF next argues that the district court erroneously admitted evidence that was either protected by the First Amendment, privileged as a matter of law, or legally irrelevant. The admissibility of

> evidence rests within the broad discretion of the trial court and its ruling will not be disturbed unless it is based on an erroneous view of the law or constitutes an abuse of discretion.

*Uselman v. Uselman*, 464 N.W.2d 130, 138 (Minn.1990) (citation omitted). Before the complaining party can show it is entitled to a new trial based on improper admissions, it must "demonstrate prejudicial error." *Id.* (citation omitted).

▆▆▆▆ We first address BASF's claims that certain evidence was protected by the First Amendment or privileged. BASF contends that its employee's truthful reports to North Dakota officials concerning possible illegal off-label use of Poast Plus were inadmissible because they were protected by the First Amendment and public policy. In support of this argument, it cites primarily defamation cases

and a prior restraint case. *See, e.g., Smith v. Daily Mail Publ'g Co.,* 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (prior restraint); *Richmond v. Nodland,* 552 N.W.2d 586 (N.D.1996) (defamation). Here, there is no claim that the reports that BASF seeks to protect were defamatory or that prior restraint was at issue. Instead, the evidence showed that BASF's employee turned in BASF's own dealers on the suspicion that Poast Plus was being used on minor crops for which they were EPA-registered although not state-labeled. This evidence was used to support the farmers' claim of consumer fraud. Misleading and confusing statements are not protected by the First Amendment. *Smith v. Condux Int'l,* 466 N.W.2d 22, 26 (Minn.App.1991). There is no support for BASF's claim that the First Amendment protects its employee's reports here.

■ Next, BASF challenges the district court's admission of an article published in the March 1993 issue of The Sugarbeet Grower magazine. The article, submitted by BASF's public relations firm, describes the illegality and consequences of off-label pesticide use, but it does not mention any BASF product. BASF contends that the First Amendment protects true speech even in a lawsuit by a private party, and it cites *N.Y. Times v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964) (libel). This consumer fraud action, however, does not raise a libel claim. Again, there is no support for BASF's claim that the district court abused its discretion in admitting the magazine article because of First Amendment concerns.

■ Finally, BASF argues that its employee's statements at the official meeting of the North Dakota Pesticide Control Board were absolutely privileged under North Dakota laws. The code states that "every person * * * has the right of protection from bodily restraint or harm, from personal insult, from *defamation,* and from injury to the persons personal relations." N.D. Cent.Code 14–02–01 (1997) (emphasis added). It provides that a communication made "[I]n any legislative or judicial proceeding or in any other proceeding authorized by law" is a privileged communication. *Id.* 14–02–05(2) (1997). BASF contends that if the statements pertain to the official proceeding, they are absolutely privileged, even if they are false and made with malice. *See Soentgen v. Quain Ramstad Clinic,* 467 N.W.2d 73, 78 (N.D.1991) (addressing privilege in a defamation action). BASF's argument is flawed for the same reason that its First Amendment argument fails: this is a consumer fraud action, not a defamation action. Consequently, there is no support for BASF's claim that these statements to the North Dakota Pesticide Control Board were protected by privilege. In conclusion, we note that as to these three claims, BASF cites no direct authority to support its arguments that the evidence was not admissible and has demonstrated no prejudicial error.

■ BASF next contends that evidence of its reports about possible off-label use by its dealers, the Sugarbeet Grower article, and its appearance before the North Dakota Pesticide Board were irrelevant to the claim of consumer fraud.

■ Relevant evidence is that having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Minn. R. Evid. 401. Generally, all relevant evidence is admissible. Minn. R. Evid. 402. The district court's decision regarding the admissibility of evidence will not be reversed absent an erroneous view of the law or an abuse of discretion. *Uselman*, 464 N.W.2d at 138.

This evidence was discussed at length at trial and was relevant to the farmers' claim that BASF violated the NJCFA. BASF has not shown that the district court abused its discretion in admitting this evidence.

██ Finally, BASF contends that the district court improperly allowed the jury to consider what it characterizes as claims of deceptive labeling and differential pricing. This court has considered and rejected most of these claims. *Peterson I*, 618 N.W.2d at 824. To the extent they were already considered, these arguments are stricken. Further, our review shows that the evidence presented and the arguments made were addressed to the issue of consumer fraud. There is no showing of error.

### IV

██ BASF contends that the district court abused its discretion when it refused to decertify the class. In support of this argument, it engages first in an extensive discussion of choice-of-law doctrine and certification law.

In *Peterson I*, this court addressed BASF's challenge to the certification of the farmers as a class for purposes of their NJCFA claim, reviewed under an abuse of discretion standard. 618 N.W.2d at 825–26. This court concluded that "the district court did not abuse its discretion in certifying [the farmers] as a class on their New Jersey Consumer Fraud Act claim." *Id.* at 826.

The farmers moved this court to strike the certification issue. BASF contends, however, that this court did not address its "choice-of-law" argument in *Peterson I* and that it is not precluded from raising the issue in this appeal. The choice-of-law argument is the basis for BASF's certification argument. In *Peterson I* this court decided the certification issue, and thus BASF is precluded from raising it a second time in this appeal. The farmers' motion to strike this argument is granted.

### V

██ Next, we turn to issues relating to prejudgment interest that the farmers raised in their notice of review. The district court determined that the farmers were entitled to prejudgment interest against BASF from December 15, 1997, the date the complaint was filed in district court. The farmers contend that because the damages were ascertainable in each year from 1992 to 1996, prejudgment interest should be calculated from those dates.

██ On appeal, questions of law governing prejudgment interest are reviewed de novo. *Trapp v. Hancuh*, 587 N.W.2d 61, 63 (Minn.App.1998). Fact determinations underlying the application of the statute, such as whether the claim is liquidated, readily ascertainable, or unliquidated, will not be reversed unless clearly erroneous. *Id.*

██ Generally, prejudgment interest may be awarded from the time of the commencement of the action. Minn.Stat. 549.09, subd. 1(b) (2002). It is also allowable on liquidated claims, as well as on unliquidated claims on which the amount is "readily ascertainable." *Trapp*, 587 N.W.2d at 63.

██ Damages are readily ascertainable if they can be determined

by computation or reference to generally recognized standards such as market value and not where the amount of damages depended upon contingencies or upon jury discretion (as in actions for personal injury or injury to reputation).

*Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 518, 189 N.W.2d 499, 504 (1971) (citations omitted). The requirement that the damages be ascertainable is based on the theory that it would be

> unreasonable to require defendant to compensate plaintiff for this loss where defendant could not have readily determined the amount of damages himself either by computation or reference to generally recognized standards such as market value.

*Id.*

In this case, the question is whether the district court was clearly erroneous in determining that the damages were not readily ascertainable. The farmers cite the fact that BASF admitted that an average price differential between Poast and Poast Plus during the class action was $4 per acre. BASF contends that the damage awards rested almost entirely on the discretion of the jury.

Both parties presented experts to calculate damages. BASF's expert arrived at a figure of $7,251,417, while respondents' expert calculated damages of $26,182,501. These differences were based on a variety of factors, including the number of gallons of Poast used per acre, whether "list" or "actual" price was used, the markup attributed to the dealer, and whether or not information for 1992, the first year for which Poast Plus was registered for use on minor crops, was used. Both experts were cross-examined and other witnesses gave testimony as well. The jury verdict for damages was $15,000,000.

■ A "mere difference" of opinion as to the amount of damages does not preclude an award of prejudgment interest. *Potter*, 291 Minn. at 519, 189 N.W.2d at 504. Instead, the issue is whether the defendant could have ascertained damages from "a generally recognized objective standard of measurement, such as readily ascertainable market value." *Id.*

Here, the experts offered different opinions as to damages based on a variety of factors. The jury's damage award, which is between the amounts offered by the parties' experts, shows that it considered the parties' contentions regarding the dates and extent of damages and other factors. The district court was not clearly erroneous in determining that damages were not readily ascertainable.

■ The farmers also contend that prejudgment interest is considered part of the substantive damages which, under New Jersey law, is subject to mandatory trebling. The NJCFA states, "[I]n any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest." N.J. Stat. 56:8–19. The farmers contend that prejudgment interest constitutes substantive damages intended to compensate the victim for deprivation of the monetary value of their loss. *See Busik v. Levine*, 63 N.J. 351, 307 A.2d 571, 575 (1973) (finding that prejudgment interest is compensatory as to the parties and represents damages for delay in payment).

■ The prejudgment interest statute is considered more procedural than substantive so that the law of the forum state applies. *Zaretsky v. Molecular Biosystems, Inc.*, 464 N.W.2d 546, 550–51 (Minn.App.1990). Prejudgment interest is

an element of compensatory damages. It is "awarded to provide full compensation by converting time-of-demand * * * damages into time-of-verdict damages." *Lienhard v. State*, 431 N.W.2d 861, 865 (Minn. 1988) (citations omitted). Where interest was awarded on trebled damages, this court allowed interest only on the first third of the trebled damages.

> [O]nly the first third of the trebled damages is compensatory. The remainder is at least "noncompensatory" and the trial court's allowance of prejudgment interest on this amount must be reversed.

*Muehlstedt v. City of Lino Lakes*, 473 N.W.2d 892, 896 n. 2 (Minn.App.1991) (quoting Minn.Stat. 549.09, subd. 1(b)(4) (1990)), *review denied* (Minn. Sept. 25, 1991).

Consequently, the district court properly applied interest only to the damages award, not the trebling of the damages award.

## DECISION

BASF has not demonstrated that it is entitled to JNOV on the jury's verdict that it engaged in consumer fraud or on the jury's award of damages. The district court did not abuse its discretion in its jury instructions, the verdict form, or in its admission of evidence. As to BASF's challenge to the class certification, this court decided the issue in *Peterson I* and under the law-of-the-case doctrine, the issue may not be raised again in this appeal. Finally, we affirm the district court's decision on prejudgment interest issues that the farmers challenge in their notice of review. In conclusion, the district court decision is affirmed, and the farmers' motions to strike are granted in part.

**Affirmed.**

G. BARRY ANDERSON, Judge (concurring specially).

I concur with the majority here, largely because of our prior holding in *Peterson v. BASF Corp.*, 618 N.W.2d 821 (Minn.App. 2000), *review denied* (Minn. Jan. 26, 2001).

But while respondents have put together a persuasive set of facts outlining misconduct on the part of appellants, at the end of the day, this dispute is the poster child for national class action reform. We have here a Minnesota district court, applying a New Jersey consumer fraud statute to a nationwide class of plaintiffs, with few of those plaintiffs residing in New Jersey. And, it is probably a fair assumption that the legislative authors of the New Jersey consumer protection scheme did not have in mind midwestern farmers purchasing agricultural chemicals as the protected class. Indeed, at least one of the amicus briefs notes that the connections with New Jersey are hardly overwhelming.

This is not a recipe for uniformity or consistency, it is fair neither to claimants nor defendants and it is long past time for national policy makers to address class action procedures.