Gary **MORTELLITE** and George **Mortellite, individually and d/b/a Buffalo Farms, et al., Plaintiffs,**

v.

**NOVARTIS CROP PROTECTION, INC., Defendant.**

No. CIV.A.99–CV–2118 JHR.

United States District Court, D. New Jersey.

Aug. 21, 2003.

---

Rudolph Westmoreland, McAllister, Westmoreland, Vesper & Schwartz, West Atlantic City, NJ, for Michael Dimeo, Anthony Dimeo, Jr., William Dimeo, Joyce Cappuccio, Gene J. Martinelli, Joseph E. Martinelli, David Rizzotte, Gregory Clark, Anthony Melora, Russell Franceschini, Scott Franceschini, John Does, plaintiffs.

Robert J. Machi, Morgan, Melhuish, Monaghan Arvidson, Abrutyn & Lisowski, Livingston, NJ, for Novartis Crop Protection Inc., defendant.

## *ORDER*

RODRIGUEZ, District Judge.

This matter has come before the Court on Defendant's motion for summary judgment based on preemption of Plaintiffs' claims by the Federal Insecticide, Fungicide, and Rodenticide Act. Oral argument

was heard on the motion on July 24, 2003. The record of that proceeding is incorporated herein. For the reasons expressed on the record of that date, and those that follow, the motion will be granted.

### Background [1]

The Plaintiffs in this matter are South Jersey blueberry farms and farmers. Defendant is a non-New Jersey corporation that, beginning in 1997, formulated, manufactured, and marketed an insecticide known as Diazinon AG600 WBC. During the Spring of 1997, Plaintiffs sprayed their blueberry fields with Diazinon AG600 WBC, either alone or mixed with a fungicide, Captan 80 WP or Captec, neither of which are manufactured by the Defendant. By the end of May, 1997, Plaintiffs began to notice damage to the blueberry plants that had been sprayed with the Diazinon AG600 WBC. Other bushes on Plaintiffs' farms that had been sprayed with other pesticides, either by themselves or mixed with Captan 80 WP and/or Captec, allegedly exhibited no damage. Plaintiffs reported the damage to the Defendant.

As the season progressed and the plants began to produce berries, Plaintiffs discovered damage to the fruit as well. From June 1997 to August 1997, representatives of Novartis, Aaron Locker, Wayne Lee, and Dr. Neil Lapp, visited the plaintiffs' farms to investigate their claims and assess the problem. Dr. Lapp testified at deposition that although Novartis' investigation failed to substantiate the farmers' contentions that Diazinon AG600 WBC caused the crop injury, the company determined that it would explore goodwill settlements with the farmers. Plaintiffs allege that in or about mid-July of 1997, Dr. Lapp. who had just become Defendant's

Technical Services Manager on July 2, 1997, told Plaintiffs not to hire an attorney, because Novartis would treat them fairly and compensate them for all of their damage, present and future. Allegedly at the direction of Dr. Lapp, during the Fall of 1997, all of "the settling plaintiffs" submitted documentation to Novartis outlining only the damages they had suffered during the crop year. These Plaintiffs allege that Dr. Lapp represented that Novartis would talk to them about further damages to their crops, plants, and land sustained during the crop years 1998 and following, after those particular years were over.

From November of 1997 through January of 1998, Defendant entered into settlement agreements with the majority of the Plaintiffs. Each of these "settling plaintiffs" signed a Release indicating that he or she received settlement proceeds

> in full satisfaction and extinguishment of all claims and causes of action against [defendant] . . . arising out of any damage or loss, present or future, to crops, plants, animals, fish or land, direct or indirect, known or unknown allegedly sustained by the [settling plaintiff] as a result of the use of [Diazinon AG600].

The Release further provided, "It is agreed that this is a business decision in compromise of a disputed claim and that the making of this payment is not an admission of liability on the part of [Defendant]."

The settling Plaintiffs also signed a Confidentiality Agreement, which stated:

> The goodwill settlement which has been negotiated between [defendant] and the owner/manager of the crop in question is a business transaction. Each party is required to keep the details of the

---

**1.** The facts of the case were set forth in this Court's December 20, 2000 Opinion granting summary judgment for the Defendant against several Plaintiffs. They are repeated here for the convenience of the reader.

agreement confidential. If either party violates this Confidentiality Agreement, both agree that this goodwill settlement may be null and void.

In the Spring of 1998, it became apparent that there was continuing damage to all of the plants that had been sprayed with the Diazinon AG600 WBC the previous year. Some of the plaintiffs again contacted Novartis about these damages, but Dr. Lapp told them that the company had closed its files on the matter and had no intention of considering further damage caused by Diazinon AG600 WBC.

Thus, the essence of the dispute in this case centers around damage allegedly caused to Plaintiffs' blueberry plants and crops by a chemical manufactured by Defendant. Defendant asserted that the majority of Plaintiffs signed a Release concurrent with taking certain sums in settlement of this claim after evaluating initial damage to the 1997 crops, with the Releases giving up all rights to future damages. However, the "settling Plaintiffs" sought to avoid the Releases by asserting that Defendant fraudulently induced them into signing.

The Second Amended Complaint, filed in August of 1999, contains seven counts, Count I has alleged Strict Products Liability in that Diazinon AG600 had a latent defect which made it unreasonably dangerous to Plaintiffs' plants and land, and which resulted in injury to Plaintiffs' plants and land.

Count II states a claim for Negligence in that the defendant negligently placed Diazinon AG600 into the stream of commerce, and was negligent in formulating, testing, manufacturing, and distributing Diazinon AG600.

Count III alleges Fraud in that the defendant told plaintiffs that any settlement reached for damages was for the crop year 1997 only, but defendant knew that this was a misrepresentation and that it was fraudulently inducing the plaintiffs to sign the Releases. Plaintiffs allege that they relied on defendant's representations and signed releases, and that such reliance was detrimental as there was future damage.

Count IV alleges Negligent Misrepresentation/Fraud by stating that the defendant marketed its product as effectively controlling certain insects without inflicting adverse effects on plants or soil and the defendant knew or should have known that this was a false statement regarding a material fact. Plaintiffs allege they relied to their detriment and suffered damages.

Count V alleges Breach of Covenant of Good Faith and Fair Dealing in that plaintiffs believed, from representations of the defendant, that the Release agreements pertained to damages for the 1997 crop year only. Plaintiffs allege that they were told that subsequent damages to their plants and land would be discussed during subsequent crop years; however, it allegedly is now apparent that the defendant had no intention of compensating plaintiffs for further damages.

Count VI alleges Breach of Express Warranty in that the defendant warranted that its product would conform to the chemical description on its label and was reasonably fit for the purposes stated on its label when used in accordance with it and defendant further warranted that its product would act as an insecticide and would not injure plants and land.

Count VII alleges Breach of the New Jersey Consumer Fraud Act by defendant's deceptive representation that its product was safe to use on blueberry plants as an insecticide.

On December 20, 2000, the Court granted in part and denied in part Defendant's motion for summary judgment on the Re-

lease issue. Because alleged misrepresentations made by the Defendant to Plaintiffs Joyce Cappuccio, Anthony Melora, Gene Martinelli, and Joseph Martinelli could have been seen as pertaining to the "purport or contents" of the Releases and they may have induced these Plaintiffs to sign the Releases, the Court refused to give effect to their Releases in order to dismiss the claims of these Plaintiffs. Thus, Defendant's motion for summary judgment was denied as to the claims of those four Plaintiffs. Additionally, finding the Defendant's lack of explanation that the Release cut off future damages after the Defendant allegedly told some Plaintiffs that seeking counsel of anyone, including an attorney, would lead to a withdrawal of the settlement offer, may have constituted "basic unfairness in the circumstances attending the execution of the Release" for each of those Plaintiffs, the Court also denied summary judgment as to the claims of Plaintiffs Clark and Franceschini. The Court gave effect to the rest of the Releases and dismissed the remaining settling Plaintiffs' claims as the Releases covered "all claims and causes of action" for "any damage or loss, present or future."

On July 26, 2001, the Court clarified that it granted Defendant's motion for summary judgment on Plaintiffs' claims insofar as they sought rescission of the Releases they signed with Novartis because the Plaintiffs had not returned the consideration they received. The Court denied the motion for summary judgment on Plaintiffs' reformation claims, however, because it is possible for the Plaintiffs to show a unilateral mistake on their part along with fraud on the part of the Defendant. The Court also determined that the Plaintiffs would be limited to equitable remedies on the Releases they signed with Novartis, and would be precluded from pursuing claims for legal damages for breach of contract or legal fraud.

The remaining non-settling Plaintiffs are Michael DiMeo and William DiMeo, individually and d/b/a Indian Brand Farms, Inc. and Anthony DiMeo, Jr. and William DiMeo, individually and d/b/a Columbia Fruit Farms, Inc. The remaining "settling plaintiffs" are Joyce Cappuccio, Gregory Clark, Russell Franeschini, Gene Martinelli, Joseph Martinelli, and Anthony Melora.

### Defendant's Motion for Summary Judgment based upon FIFRA Preemption

Novartis now contends that Plaintiffs' claims challenge the adequacy of an EPA-registered pesticide label and, as such, they are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136v(b). Alternatively, the defense argues that Plaintiffs' claims are in direct conflict with the FIFRA regulatory scheme and are therefore impliedly preempted.

Defendant asserts that Plaintiffs' claims of strict liability, negligence, negligent misrepresentation/fraud, express warranty, and breach of the New Jersey Consumer Fraud Act[2] are all, in essence, claims that Novartis should have placed a warning on the label of its product that it should not be used in combination with Captan and/or Captec because such a mixture could injure blueberry plants. "Plaintiffs' theories of liability in this action, however, couched, are all based on Plaintiffs' assertion that Novartis failed to adequately warn blueberry growers about potential damages to

**2.** Defendants argue that all claims other than Count III for fraud and Count V for breach of covenant of good faith and fair dealing, both of which deal with the Release issue, are preempted.

blueberries from an application of Diazinon AG600 when mixed with Captan 80 WP or Captec."

The Defendant goes through the deposition testimony of Plaintiffs and their experts to demonstrate the "inherent challenge to the Diazinon AG600 label." Novartis also boils down Plaintiffs' claims to these allegations:

— that Novartis should have warned on the label that Diazinon AG600 contained a specific surfactant so the growers would not have mixed it with Captan or Captec;

— that Novartis should have tested the compatibility of the Diazinon AG600/Captec tank mixes and then warned about the incompatibility of these tank mixes;

— that Novartis should have warned about the Diazinon AG600/Captec tank mixes, either on the label or through other "point of sales" means; and

— that Novartis is liable for misrepresentation or fraud by telling Rutgers University and Plaintiffs in the promotional brochures that Diazinon AG600 was a safe product for blueberries.

So Novartis argues that FIFRA expressly preempts all of Plaintiffs' claims against it. Alternatively, Novartis argues that FIFRA impliedly preempts all of Plaintiffs' claims because, since federal law permitted Novartis to sell Diazinon AG600 with precisely the chemical composition and labeling as that purchased by Plaintiffs, imposing liability on Novartis would conflict with the regulatory structure of FIFRA. Finally, Defendant argues, as another alternative, that the New Jersey Consumer Fraud Act Count cannot stand because it creates a direct conflict with another statutory and/or regulatory scheme in a "heavily regulated industry."

Plaintiffs have opposed the motion for summary judgment, arguing that their claims are not failure to warn, label-based claims, but rest in strict liability for defective design and defective manufacturing, as well as negligent misrepresentation, negligence, breach of warranty, and consumer fraud. They assert that Defendant has based its motion on the broadest possible reading of FIFRA's preemption clause, which interpretation has been rejected by the two cases at the heart of the analysis—*Hawkins* and *Medtronic.*

Plaintiffs also argue that this Court should deny preemption because the product is substantial equivalent of its forerunner, and the previous tests were submitted to the EPA, rather than updated versions. Argued differently, Plaintiffs urge that the Defendant is required to produce credible evidence that the EPA specifically considered the new formula and its design and manufacturing process, including its testing program, and then produced a specific mandate reflected on the label after weighing the interests of the consumer and Novartis and reaching an unambiguous conclusion.

*Summary Judgment Standard*

This Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute

about the fact might affect the outcome of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be satisfied by showing that the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.; Maidenbaum v. Bally's Park Place, Inc.*, 870 F.Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. "A nonmoving party may not 'rest upon mere allegations, general denials or ... vague statements....'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir.1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991)).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Supreme Court has further held. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 150–51, 120 S.Ct. 2097 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505) (internal quotation marks omitted). Accordingly, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151, 120 S.Ct. 2097.

*Analysis*

■ Under Article VI, the Supremacy Clause, of the United States Constitution, "the laws of the United States shall be the supreme Law of the Land," U.S. CONST. art. VI, cl. 2. The Supreme Court has held that state law that conflicts with federal law is invalid under the Supremacy Clause. *See Maryland v. Louisiana*, 451 U.S. 725, 726, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). Congressional intent determines whether a federal statute preempts state law. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). That intent may be explicit in the statute itself. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Accordingly, where Congress has included an express provision in the statute, there is no need to imply Congress' intent regarding preemption from other provisions. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). The Court still must determine the "domain expressly preempted." *Hawkins*, 184 F.3d 244, 247 (3d Cir.1999).

■ The preemption component of FIFRA is located in Title 7 of the United States Code, Section 136v, which states:

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter. Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

Through FIFRA, Congress created a comprehensive licensing and labeling scheme, for pesticides and other poisonous devices designed to kill insects, that culminates in the approval of the labels by the EPA. *See Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). Further, FIFRA establishes a complex process of reviewing the label under which the product is to be marketed:

> In the registration process, the EPA must find that the labeling complies with FIFRA's requirements. 7 U.S.C. § 136a (c)(5)(B). FIFRA requires manufacturers to submit draft language addressing a number of different topics, including ingredients, directions for use, and adverse effects of the products. 7 U.S.C. § 136a(c); 40 C.F.R. § 152 .50. A final label must be submitted to the EPA prior to registration. 40 C.F.R. § 156.10(a)(6). Given the comprehensive nature of the FIFRA's labeling process, it is apparent that section 136(v)(b), prohibiting any state requirement in addition to or different from the federal requirements, dictates the preemption of any state common law cause of action that rests on an alleged failure to warn or communicate information about a product through its labeling.

*Worm v. American Cyanamid Co.,* 5 F.3d 744, 747 (4th Cir.1993). Thus, courts have recognized that FIFRA is more than "a labeling law," but is "a comprehensive regulatory statute." *Wisconsin,* 501 U.S. at 601, 111 S.Ct. 2476 (citing *Ruckelshaus v. Monsanto,* 467 U.S. 986, 991, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)).

Additionally, the EPA "shall register a pesticide" if the agency determines, in light of any restrictions placed on the pesticide's use:

> (A) its composition is such as to warrant the proposed claims for it;

> (B) its labeling and other material required to be submitted comply . . . ;

> (C) it will perform its intended function without unreasonable adverse effects on the environment; and

> (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5).

The Third Circuit Court of Appeals has held that FIFRA preempts State law failure to warn actions, as such are predicated on labeling requirements within the meaning of FIFRA. *Hawkins v. Leslie's Pool Mart, Inc.,* 184 F.3d 244, 251 (3d Cir.1999) (relying on *Cipollone* to reason that "the EPA requirements for labeling pesticides are sufficiently specific to mandate preemption of claims based on state statutes of common law"). The Circuit has stated that the comprehensiveness of FIFRA "leads us to conclude . . . labeling claims are preempted. To hold otherwise would be to impose labeling requirements additional to those mandated by the EPA." *Id.* Thus, in *Hawkins,* the Third Circuit addressed the preemptive effect of FIFRA, holding that damage claims for improper labeling under FIFRA are preempted if they impose requirements in addition to or different from those imposed by the EPA, the agency charged with enforcement of FIFRA. *Hawkins,* 184 F.3d at 249.

The Plaintiffs argue that the Complaint does not allege failure to warn. The Court must ask, however, whether Plaintiffs have articulated (and supported) a theory of liability that does not, at its heart, challenge the product label. "It is immaterial whether an inadequate labeling or failure to warn claim is brought under a negligence or products liability theory." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 608 (8th Cir. 1999). "When a claim, however couched, boils down to an assertion that a pesticide's label failed to warn of the damage plaintiff allegedly suffered, the claim is preempted by FIFRA." *Etcheverry v. Tri–Ag Serv., Inc.*, 22 Cal.4th 316, 93 Cal. Rptr.2d 36, 993 P.2d 366, 377 (2000). *See also National Bank*, 165 F.3d at 608 (finding FIFRA preempted common law claim for breach of express warranty because "state law claim [was] *premised* on inadequate labeling or a failure to warn," resulting in imposition of additional or different labeling requirements); *Anderson v. Dow Agrosciences LLC*, 262 F.Supp.2d 1280, 1288 (W.D.Okla.2003) (finding that plaintiff's negligence, breach of express and implied warranty, deceptive trade practices, fraud, and negligent representation claims could be characterized as failure to warn claims preempted under FIFRA). As the defense points out, in determining whether a State claim is preempted under FIFRA, "the issue may . . . be resolved by looking to, as one factor, whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the

error, would choose to alter the product or the label." *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747–48 (4th Cir.1993). "[F]armers' claims are expressly preempted under § 136v(b) if a judgment against [the defendant] would induce it to alter its product label." *Dow Agrosciences LLC v. Bates*, 332 F.3d 323, 331 (5th Cir.2003).

The Court is bound by the currently-existing law of this Circuit to find that FIFRA preempts Plaintiffs' State law claims. Plaintiffs' State law claims relate directly or indirectly to the fact that Novartis did not warn on its product label that the product should not be tank mixed with Captan or Captec.[3] Pursuant to FIFRA, Novartis registered Diazinon AG600 with the EPA and the EPA approved the label submitted by Novartis. Allowing these claims to proceed would be, in effect, permitting State law damages claims to impose label requirements "in addition to or different from" the federally approved label and FIFRA.

Count I has alleged Strict Products Liability in that Diazinon AG600 had a latent defect which made it unreasonably dangerous to Plaintiffs' plants and land, and which resulted in injury to Plaintiffs' plants and land. Plaintiffs argue that the formula for Diazinon AG600 is defective because the surfactant made it unreasonably dangerous,[4] as "everyone knew that the product would be mixed." As discussed at oral argument, there is no evidence of design defect when the product is used by itself, without introducing Captan

---

3. Apparently, in 1998, Novartis altered the label of Diazinon AG600 to include the following warning: "Do not mix D.z.n. diazinon AG600 with any formulation of Captan or Captec because crop injury may occur."

4. Insofar as Plaintiffs have attempted to assert that the surfactant made the product unreasonably dangerous and so should have been listed on the product label, the Court notes

that the EPA does not require registrants to identify individual inert ingredients, such as surfactants, that are not highly toxic on the product label. *See* 7 U.S.C. § 136h(d)(1)(C); 40 C.F.R. § 156.10(g)(1) & (7). Indeed, inert ingredients are considered confidential under FIFRA. *Northwest Coalition for Alternatives to Pesticides v. Browner*, 941 F.Supp. 197, 199–201 (D.D.C.1996).

or Captec. Even the expert reports on which Plaintiffs rely in attempt to prove that Diazinon AG600 was inherently dangerous (and that Novartis's failure to test was negligent) qualify their opinions by limiting the danger to situations when the product is mixed with Captan or Captec. (*See* 9/24/01 Whitcomb report at 3; 9/28/01 Witt Memo.)[5] Because there is no evidence that the product, unmixed, is inherently dangerous, the remedy for this products liability claim would be to change the label of the product to warn that it should not be mixed with Captan or Captec. Thus, the defective design claim is really a claim for failure to warn. *See Dow Agrosciences LLC v. Bates,* 332 F.3d 323, 332 (5th Cir.2003) (finding "the heart" of plaintiffs' defective design claim was that defendant did not disclose that the pesticide at issue was dangerous to peanut crops in soil with a pH level over 7.0; the pesticide was not unreasonably dangerous for use on all peanut crops; thus, the claim was functionally a disguised claim for failure to warn about use on soil with high pH, and was expressly preempted by FIFRA).

Plaintiffs additionally claim, however, that the manufacturing process for Diazinon AG600 was defective because the product was not tested.[6] The defense argues that there is no real claim that the product is defective in manufacture or design, so Plaintiffs' claim must be grounded in failure to warn. The Court agrees, and finds, moreover, that if the EPA has decided that the Defendant does not have to test its product in combinations,[7] then holding Defendant liable for not testing in such combinations would impose requirements in addition to or different from those federally mandated. As stated by another district court, "If the federal government's labeling requirements are limited to pesticide characteristics A, B, and C, and a state imposes a labeling requirement related to pesticide characteristic D, the conclusion that the state requirement is both 'in addition to' and 'different from' the federal requirements seems inescapable." *Dahlman Farms, Inc. v. FMC Corp.,* 240 F.Supp.2d 1012, 1018 (D.Minn. 2002).

Further, "merely to call something a design or manufacturing defect claim does not automatically avoid FIFRA's explicit preemption clause." *Grenier v. Vermont Log Buildings, Inc.,* 96 F.3d 559, 564 (1st Cir.1996). Other courts have similarly rejected the "negligent testing theory" as a vain attempt to avoid FIFRA preemption. *See, e.g., Taylor AG Indus. v. Pure–Gro,* 54 F.3d 555, 560 (9th Cir.1995) (FIFRA preempted negligent testing claim where only evidence produced was allegedly inadequate product label); *Worm,* 5 F.3d at 748 (same); *Dahlman Farms,* 240 F.Supp.2d at 1019 (finding that, although couched in terms of negligent testing, claim was premised on inadequate labeling and was therefore preempted); *Anderson,* 262 F.Supp.2d at 1288 (finding preemption

---

5. Contrary to Plaintiffs' position, the experts need not blame the damage on a label's failure to warn for the Court to characterize a claim as such.

6. Plaintiffs assert that Novartis subsequently tested Diazinon AG600 WBC to confirm its compatibility with other products and found that by adding sufactant X77, the product was compatible with five otherwise incompatible products, including Captan/Captec. Yet the product was not changed, as the Defendant continues to assert that the product. Diazinon AG600, is safe for blueberries when used alone.

7. The defense points out that the EPA has stated, "in cases where the pesticide labels are silent on the matter of tank mixing, applicators [are] permitted to use tank mixes *at their own risk."* Revised Policy on Label Claims for Tank Mixing, Pesticide Regulation (PR) Notice 82–01 (Jan. 12, 1982) (emphasis added).

where plaintiff alleged deficient testing procedures because a product was never specifically tested on Oklahoma soil, as the claim necessarily required a showing that the defendant should have included an additional warning on its label regarding use in Oklahoma). The claim that Diazinon AG600 was defectively designed or manufactured because it was foreseeable that it would be used with Captec or Captan on blueberries and that it was unfit for such use is effectively no more than an attack on the failure to warn against such use. As such, the claim is preempted.

Count II states a claim for Negligence in that the defendant negligently placed Diazinon AG600 into the stream of commerce, and was negligent in formulating, testing, manufacturing, and distributing Diazinon AG600. Again, there is no evidence that placing Diazinon AG600 into the stream of commerce constitutes negligence; the issue is whether the manufacturer should have warned that the product should not be tank mixed with certain other chemicals. "If a pesticide manufacturer places EPA-approved warnings on the label and packaging of its product, its duty to warn is satisfied, and the adequate warning issue ends." *Papas v. Upjohn Co.*, 985 F.2d 516, 518 (11th Cir.1993). Because the EPA decides whether a pesticide manufacturer has satisfied its duty of care in the product's safety and its duty to warn in the product's label, EPA approval essentially represents a finding of due care on the manufacturer's part. The risk that a pesticide will create hazards or adverse effects on the crop is addressed by the EPA. *See* 40 C.F.R. § 158.202(h)(1). Because harm to the crop is a risk that the EPA considers in its label approval process, the EPA's approval of Diazinon AG600 and its label represents the agency's determination that the product was fit for use. The Court finds that Count II of the Complaint is preempted.

Count VI alleges Breach of Express Warranty in that the Defendant warranted that its product would conform to the chemical description on its label and was reasonably fit for the purposes stated on its label when used in accordance with it and Defendant further warranted that its product would act as an insecticide and would not injure plants and land. Putting aside any issues of reliance, because this claim involves allegations that the Defendant's EPA-approved label inadequately warned against use on blueberry plants when mixed, it is preempted. *See Netland v. Hess & Clark, Inc.*, 284 F.3d 895, 898 (8th Cir.2002) ("Common law claims for breach of express warranty ... are preempted by FIFRA."); *Grenier*, 96 F.3d at 564 (express warranty claim preempted because "[t]o premise liability on the inaccuracy of the statement [on the label] is in substance to determine that a different statement should have been made in the labeling"); *Taylor AG Indus.*, 54 F.3d at 563 ("To the extent the implied warranty claim depends upon inadequacies in labeling or packaging, FIFRA section 136v preempts the claim.") (internal quotations omitted); *Lowe v. Sporicidin Int'l*, 47 F.3d 124, 129 (4th Cir.1995) ("express warranty claim based on EPA-approved labeling materials is preempted"); *Worm*, 5 F.3d at 749 (breach of express warranty claims preempted where representation at issue was not voluntary but required and approved by the EPA).

Count IV alleges Negligent Misrepresentation/Fraud by stating that the Defendant marketed its product as effectively controlling certain insects without inflicting adverse effects on plants or soil and the Defendant knew or should have known that this was a false statement regarding a material fact. Plaintiffs allege they relied to their detriment and suffered damages. Similarly, Count VII alleges Breach of the

New Jersey Consumer Fraud Act by Defendant's deceptive representation that its product was safe to use on blueberry plants as an insecticide. Again, the Court finds that these claims, in effect, are failure to warn claims subject to preemption.

Plaintiffs argue that false statements about improved crop safety for blueberries ("better crop safety, equal performance"; "increased safety to environment") were contained in a brochure from Novartis that was completely independent from the label and did not accompany the product. Plaintiff contends that the negligent misrepresentation and consumer fraud claims are based on the marketing brochure, which allegedly contained false, deceptive, and misleading statements, as well as omissions of material facts, representing that money had been expended for testing the product, when the only testing done was on a prior version of Diazinon, and when testing was done only on apples ("formulation technology has been tested for several years around the world"; "Novartis has invested more than $30 million to complete the necessary studies to comply with EPA's stringent guidelines for new products.").

■ Because the representations in the brochure are consistent with the label, that the product was safe for use on blueberries, preemption still results. *See Kuiper v. American Cyanamid Co.*, 131 F.3d 656, 662–63 (7th Cir.1997) (off-label statements about product safety which merely reiterate information/restrictions found on label itself are preempted). When advertising or promotional materials merely repeat information or language contained on the label, claims directed at the advertising necessarily challenge the label itself and are therefore preempted. *Id.* (citing *Lowe*, 47 F.3d at 130; *Worm*, 5 F.3d at 748). Some circuits have held that FIFRA preempts even State law claims against

advertisements that "substantially differ" from the label. *See Taylor*, 54 F.3d at 561 (quoting *Papas*, 985 F.2d at 519) ("any claims that point-of-sale signs, consumer notices, or other informational materials failed to adequately warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging."). "Because claims challenging the adequacy of warnings or materials other than the label or package of a product necessarily imply that the labeling and packaging fail to warn the user, we conclude that these claims are also preempted by FIFRA." *Papas*, 985 F.2d at 519.

Approving a label that implies Diazinon AG600 is safe for use on blueberries is within the EPA's authority under FIFRA, which discusses adverse effects on the environment, defined as "water, air, land, and all plants and man and other animals living therein, and the interrelationships which exist among these." 7 U.S.C. § 136(j). Further, the statement that Diazinon AG600 was safe for use on blueberries was not necessarily false. As stated previously, nothing in the record indicates that the product, unmixed, was not safe. Plaintiffs have failed to establish a genuine issue of material fact that the wording of any Novartis brochure differed in any material manner from the EPA-approved label. Thus, the negligent misrepresentation and fraud claims are preempted under § 136v(b).

Because the legal duty that is the predicate of the Plaintiffs' State law damages actions constitutes a requirement for labeling or packaging in addition to or different from those required under FIFRA, the claims are preempted.

Count III of the Complaint alleges Fraud in that the Defendant told Plaintiffs that any settlement reached for damages was for the crop year 1997 only, but De-

fendant knew that this was a misrepresentation and that it was fraudulently inducing the Plaintiffs to sign the Releases. Plaintiffs allege that they relied on Defendant's representations and signed Releases, and that such reliance was detrimental as there was future damage. Count V alleges Breach of Covenant of Good Faith and Fair Dealing in that Plaintiffs believed, from representations of the Defendant, that the Release agreements pertained to damages for the 1997 crop year only. Plaintiffs allege that they were told that subsequent damages to their plants and land would be discussed during subsequent crop years; however, it allegedly became apparent that the Defendant had no intention of compensating Plaintiffs for further damages. The remaining Plaintiffs have been limited to equitable relief on these two claims.

Because the Court has found that Plaintiffs' liability claims are preempted and must be dismissed, these claims regarding the Releases also will be dismissed, as even if the Court were to reform the Releases, there would be no underlying liability.

### Conclusion

For the foregoing reasons, and those expressed during oral argument,