**Ronald PETERSON, et al., Respondents,**

v.

**BASF CORPORATION, a foreign corporation, Appellant.**

No. C3–02–857.

Supreme Court of Minnesota.

Feb. 19, 2004.

to raise ineffective assistance of trial counsel.

*Doppler,* 660 N.W.2d at 802.

Winthrop A. Rockwell, James A. O'Neal, John P. Borger, Bruce Jones, Faegre & Benson, L.L.P., Minneapolis, MN, Kenneth F. Johannson, Johannson, Rust, Fagerlund, Yon & Stock, P.A., Crookston, MN, for Appellant.

Hugh V. Plunkett, III, J. Michael Schwartz, Robert K. Shelquist, Yvonne M. Flaherty, Lockridge Grindal Nauen P.L.L.P., Douglas J. Nill, Douglas J. Nill, P.A., Minneapolis, MN, for Respondents.

Lawrence S. Ebner (pro hac vice), McKenna Long & Aldridge L.L.P., Washington, D.C., for Amicus Curiae Croplife America.

Robin S. Conrad, National Chamber Litigation Center, Inc., Evan M. Tager, Richard B. Katskee, Mayer, Brown, Rowe, & Maw, Washington, D.C., for Amicus Curiae Chamber of Commerce of the United States.

Thomas F. Nelson, Robert L. DeMay, Todd A. Noteboom, Leonard, Street & Deinard, Minneapolis, MN, for Amicus Curiae National Association of Independent Insurers.

Susan E. Stokes, David R. Moeller, Farmers' Legal Action Group, Inc., St. Paul, MN, Elizabeth J. Cabraser, Scott P. Nealey, Lieff Cabraser Heimann & Bernstein, San Francisco, CA, for Amicus Curiae Minnesota Farmers Union.

William F. Mohrman, Mohrman & Kaardal, Minneapolis, MN, Daniel J. Popeo, Richard A. Samp, Washington Legal Foundation, Washington, D.C., for Amicus Curiae Washington Legal Foundation.

Jan S. Amundson, General Counsel, Quentin Riegel, Deputy General Association, National Association of Manufacturers, Washington, D.C., Latessa T. Ward, Cassandra K. Ward Brown, Ward & Ward LLC, Minneapolis, MN, David F. Zoll, Donald Evans, American Chemistry Council, Arlington, VA, Robert H. Morse, Washington, D.C., for Amicus Curiae National Association of Manufacturers and the American Chemistry Council.

Wayne D. Struble, Bowman And Brooke, LLP, Minneapolis, MN, Hugh F. Young, Jr., Product Liability Advisory Council, Reston, VA, for Amicus Curiae Product Liability Advisory Council, Inc.

Mike Hatch, Attorney General, State of Minnesota, Prentiss Cox, Assistant Attorney General, Erik Lindseth, Assistant Attorney General, St. Paul, MN, for Amicus Curiae State of Minnesota.

Michael R. Docherty, Rider Bennett, LLP, Minneapolis, MN, Victor Schwartz, Leah Lorber, Shook, Hardy & Bacon, L.L.P., Washington, D.C., for Amicus Curiae American Tort Reform Association.

Bruce M. Kleven, St. Paul, MN, for Amicus Curiae American Sugarbeet Growers Association.

J. Gordon Rudd, Jr., Zimmerman Reed, P.L.L.P., Sharon L. Van Dyck, Minneapolis, MN, for Amicus Curiae Minnesota Trial Lawyers Association.

## OPINION

GILBERT, Justice.

This appeal arises out of a nationwide consumer fraud class action in which a group of farmers ("farmers") asserted that BASF Corporation's ("BASF") marketing misled and deceived American farmers into believing that a BASF herbicide, Poast Plus, could not be used on crops such as sugar beets. The farmers claimed that BASF's marketing manipulated them into purchasing Poast, a higher-priced BASF herbicide. BASF appeals the judgment rendered against it for violating the

New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. §§ 56:8-1–56:8-116 (West 2002), which the court of appeals affirmed. BASF argues that class certification and the application of New Jersey law to all the claims in the class were inappropriate, federal law preempts the farmers' consumer fraud claims, and the evidence was not sufficient to establish consumer fraud under the NJCFA. We affirm.

BASF is a Delaware corporation with its principal office in New Jersey. In the late 1970s and early 1980s, BASF began developing and testing Poast herbicide for use in controlling grass weeds. Around 1982, BASF registered Poast with the Environmental Protection Agency (EPA) as a post-emergent grass herbicide and began marketing the product for use. Over time, BASF sought approval from the EPA for the use of Poast on more crops and by 1992 Poast was EPA and state registered for use on over 60 crops, including all "major" crops and most "minor" crops.

"Major," or high acreage crops, include soybeans, corn, and cotton, which are farmed on millions of acres of land but provide a relatively low financial return per acre. "Minor," or high value crops, include sugar beets, vegetables, grapes, citrus fruits, and sunflowers. These crops are farmed on fewer acres, but yield a much greater profit per acre. When Poast was developed, it was the only post-emergent herbicide available for use on a number of minor crops. According to research funded by the United States Department of Agriculture, the herbicide market for minor crops has little competition because the market potential for a pest control product on specific crops is low, giving agricultural companies little incentive to absorb the cost of developing the data necessary for registration of a herbicide on individual crops, particularly minor crops.[1]

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") is a comprehensive regulatory system that governs herbicide/pesticide marketing and use.[2] FIFRA provides that a pesticide may only be distributed or used on a particular crop if the EPA has registered it for use on that crop. 7 U.S.C. § 136a(a) (2000). In addition, a state may regulate the sale or use of any federally registered pesticide to the extent the regulation does not permit any sale or use prohibited by federal law. 7 U.S.C. § 136v(a) (2000). The EPA does not, however, regulate marketing decisions on pesticide use. Federal regulations provide that "[a] registrant may distribute or sell a product under labeling bearing any subset of the approved directions for use, * * *." 40 C.F.R. § 152.130(b) (2000). However, if a registrant does not sell a product for use on a crop with labeling bearing approved directions for use, a state may, under section 24(c) of FIFRA, issue a "special local needs" registration for a product for crop uses that the EPA has approved. See 40 C.F.R. §§ 162.150–162.156 (2000).

In addition to registration requirements, federal regulations require distributors of pesticides to comply with packaging and labeling regulations. "Every pesticide product shall bear a label containing the information specified by [FIFRA] and the regulations in this part * * *." 40 C.F.R. § 156.10(a)(1) (2000). Pesticide labels

---

1. Interregional Research Project No. 4 (The IR-4 Project), A Minor Crop Pest Control Strategy: 1995–2002.

2. The terms "herbicide" and "pesticide" are used interchangeably in this opinion. Under the FIFRA, the term "pesticide" means "any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest," which includes "weed[s]." 7 U.S.C. § 136(t), (u) (2000).

must contain information on content, hazards, instructions for use, restrictions on use, and much more. *Id.* Use of a pesticide for a purpose or product not specified in the label is referred to as "off-label" use.

In the late 1980s, BASF began developing another agricultural herbicide, Poast Plus. Evidence was presented at trial on the similarities and differences between Poast and Poast Plus. The two products contain the same active ingredient, sethoxydim, which is equivalent between them in amounts distributed per acre.[3] Poast Plus, however, also contains a crop oil adjuvant[4] that, according to its patent, allows the mix, when added to water, to provide "equal or better herbicidal efficiency" than standard herbicide formations when mixed. Poast and Poast Plus are patented separately and the EPA required BASF to register the products separately. *See* 40 C.F.R. § 152.43(a) (2000).[5] The EPA registered Poast Plus for use on the same 60 crops for which Poast was registered because registration was based on the same residue data that BASF used for Poast, which the EPA allowed because the two products use the same active ingredient.

However, BASF obtained state registration and labeled Poast Plus for use on only four crops: soybeans, cotton, peanuts, and alfalfa. From 1992–1996, Poast Plus was priced at approximately $4 per acre less than Poast. Evidence was presented at trial that BASF's strategy was to segment the market for the products between major and minor crops. For example, a 1990 BASF marketing plan stated that BASF's goal was to systematically replace Poast sales in soybeans and cotton with Poast Plus while aggressively positioning the higher-priced Poast in the market for minor crops, where there was less competition. The farmers argued that by limiting the number of crops for which Poast Plus was labeled, BASF was able to target the less-expensive Poast Plus in the more competitive major crop market and target Poast for sale in the less competitive minor crop market. According to the farmers, evidence indicated that BASF intended to conceal that Poast Plus was EPA approved for the same 60 crops as Poast.

The farmers presented evidence at trial that BASF advertised Poast as the "only" post-emergent grass herbicide registered for use on minor crops. Poast Plus, according to BASF advertisements, was "registered" for use only on cotton, soybeans, peanuts, and alfalfa, while Poast was "registered" for use on over 60 crops. BASF mailed a letter to food suppliers enclosing a list of BASF products and the crops for which they were registered making these claims. The letter stated that the goal of this list was to "ensure our food supply remains the safest in the world" by "informing producers and processors alike of proper pesticide use." A BASF executive testified that he considered it a material omission to say that Poast Plus was only registered for use on four crops.

---

3. Poast is formulated with 18% sethoxydim and covers 8 acres per gallon after being mixed—a ratio of 0.19 pounds/acre. Poast Plus is formulated with 13% sethoxydim and covers 5.3 acres per gallon after being mixed—a ratio of 0.19 pounds/acre.

4. An "adjuvant" is "an ingredient (as in a prescription or a solution) that modifies the action of the principal ingredient." *Merriam*

*Webster's Collegiate Dictionary* 15 (10th ed.1986).

5. "A product proposed for registration must have a single, defined composition, except that EPA may approve a basic formulation and one or more alternative formulations for a single product." 40 C.F.R. § 152.43(a) (2000).

In the early-to-mid 1990s, sugar beet farmers in North Dakota began to purchase the less expensive Poast Plus and use it off-label on crops not labeled for use by Poast Plus. A BASF sales representative informed the North Dakota Department of Agriculture of the off-label use, which led the department to fine these farmers as well as the wholesale distributors of Poast Plus.[6] To further inhibit off-label use, BASF's public relations firm submitted an article published in *Sugarbeet Grower* magazine, which discussed the illegality of off-label use of herbicides and increased enforcement of penalties for not following the recommendations on pesticide labels.

The North Dakota Commissioner of Agriculture began to investigate Poast Plus' registration by making inquiries with BASF and the EPA. BASF representatives responded that BASF could not add crops to the Poast Plus label because the EPA would require it to do further residue testing, which would cost the company millions of dollars. The EPA, however, responded with information that Poast Plus was registered for use on the same crops as Poast, and that the farmers' problem stemmed from a company marketing decision. In 1995, the State of North Dakota and the State of South Dakota issued section 24(c) special local needs registrations for Poast Plus to be used on minor crops such as sugar beets and dry beans. BASF wrote the EPA, arguing that the purpose of section 24(c) registrations was violated by states being allowed to issue them sole- ly on the basis that Poast Plus was a less-expensive sethoxydim-based product.

This class action before us here on appeal commenced in 1997. On July 15, 1999, the district court certified a nationwide class of plaintiffs to bring suit under the NJCFA,[7] finding that the farmers met the requirements of Minn. R. Civ. P. 23. The court concluded that it was neither arbitrary nor fundamentally unfair to certify a nationwide class for claims brought under the NJCFA and that class certification was appropriate because of the vast number of potential plaintiffs, the small size of individual claims, the common nature of the claims based on BASF's national marketing practices, and the public interest in seeing that the rights of consumers are vindicated. The class consists of U.S. farmers who purchased Poast herbicide from BASF from 1992–96, excluding North Dakota farmers who had previously brought a separate class action suit that was settled in 1997. On March 1, 2000, the district court denied BASF's subsequent motion to decertify the class, but granted BASF's motion for summary judgment, concluding that BASF's actions were not fraudulent or unconscionable and the farmers did not suffer an ascertainable loss, as required by the NJCFA.

On April 27, 2000, the farmers filed an appeal with the court of appeals, challenging the district court's grant of summary judgment. On May 1 and May 2, 2000, BASF filed notices of review pursuant to

---

6. FIFRA allows the EPA and state departments of agriculture to enforce violations of product labels ("off-label" use) with civil administrative penalties, criminal sanctions, and fines. *See* 7 U.S.C. § 136j-m (2000).

7. The New Jersey Consumer Fraud Act provides, in part, "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate * * * is declared to be an unlawful practice." N.J. Stat. Ann. § 56:8–2 (West 2002).

Minn. R. Civ.App. P. 106,[8] specifically challenging in both that the district court erred (1) in certifying a nationwide class under the NJCFA and (2) in denying BASF's later motion to decertify the class. The court of appeals ordered that BASF's separate appeals were unnecessary and that both parties could proceed with their issues in the farmers' appeal.

After hearing both arguments, the court of appeals reversed the district court's grant of summary judgment, holding that "whether BASF's actions rise to the level of fraud or an unconscionable commercial practice under the [NJCFA] are issues for a jury to decide." *Peterson v. BASF Corp.*, 618 N.W.2d 821, 825 (Minn.App.), *rev. denied* (Minn. Jan. 26, 2001) ("*Peterson I*"). The court of appeals also held that the district court's decision to certify the farmers as a class was not an abuse of discretion. *Id.* at 826.

Following *Peterson I*, BASF petitioned us for review on two specific issues: (1) whether *Peterson I* improperly created a new duty requiring a manufacturer to provide the farmers with the opportunity to purchase a herbicide for a specific use, and (2) whether *Peterson I* improperly created a measure of damages based on the lost opportunity to choose to purchase Poast Plus and "allow[ed] that measure to apply to a nationwide class action." We denied the petition for review. Upon remand to the district court, BASF filed a second motion to decertify the class action. The district court denied that motion on September 11, 2001.

At trial, the jury was presented with a special verdict form and found by unanimous vote that BASF "engage[d] in an unconscionable commercial practice, deception, fraud, false pretense, false promise, or misrepresentation in relation to BASF's marketing and pricing strategies for Poast and Poast Plus herbicides" and "engage[d] in a knowing omission, suppression or concealment of the truth in relation to BASF's marketing and pricing strategies for Poast and Poast Plus." The jury also found that BASF's conduct or actions caused the farmers an ascertainable loss. At trial, the farmers had presented an expert witness who testified that based on the difference in price between Poast and Poast Plus and the number of gallons of Poast sold in the United States according to market survey data, actual damages for the years 1992 through 1996 should amount to $26,182,501. BASF presented its own expert who calculated the price differential of Poast and Poast Plus based on BASF's data, concluding that actual damages should amount to $7,251,417. The jury awarded the farmers actual damages totaling $15,000,000. Pursuant to New Jersey law,[9] the district court trebled the damages and awarded prejudgment interest and attorney fees, entering a judgment totaling $52,058,931.51. The district court denied BASF's motion for JNOV and partial JNOV as to the damages awarded for the year 1992 and for the years 1995 and 1996.

The court of appeals affirmed the district court judgment. *Peterson v. BASF Corp.*, 657 N.W.2d 853 (Minn.App.2003)

---

8. "A respondent may obtain review of a judgment or order entered in the same action which may adversely affect respondent by filing a notice of review with the clerk of the appellate courts * * *." Minn. R. Civ.App. P. 106.

9. "In any action under [the NJCFA] the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under [the NJCFA], * * * the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit." N.J. Stat. Ann. § 56:8–19 (West 2002).

("*Peterson II*"). The court of appeals held that BASF was not entitled to JNOV or partial JNOV. *Id.* at 868, 870. The court of appeals also held, among the other issues, that FIFRA did not preempt the farmers' consumer fraud action and that BASF was not entitled to a new trial based on its contention that the district court failed to instruct the jury on critical elements of its defenses or its contention that the district court improperly admitted evidence. 657 N.W.2d at 865, 871, 872–73. Furthermore, the court of appeals held that BASF's challenge to the district court's denial of its motion to decertify the class and the district court's decision to apply New Jersey law to all of the claims was barred from appeal by the law of the case doctrine. *Id.* at 873. Regarding decertification of the class and choice of law, the court of appeals reasoned that it had decided class certification in *Peterson I*, the decision to apply New Jersey law was an underlying issue to class certification, and thus BASF was precluded from raising the issues before the court of appeals a second time. 657 N.W.2d at 873.

BASF petitioned us for review specifically on the following issues: (1) whether the U.S. Constitution and the *Milkovich* test [10] permit application of the NJCFA to the claims of a nationwide class; (2) whether federal law preempts the farmers' consumer fraud claims based on deceptive labeling; and (3) whether the verdict was tainted based on BASF's First Amendment rights. BASF also stated in its petition for review that "this appeal raises other legal issues, including causation, materiality, product safety, class propriety, ascertainable loss, patent preemption, the 'duty to market,' and evidentiary support for hotly disputed facts."

We granted review to address the "issues raised [by BASF] in the petition for further review," with the exception of BASF's First Amendment argument. In addition, we asked the parties to address: (1) whether law of the case principles preclude supreme court review of underlying issues pertaining to class certification; and (2) if law of the case principles do not preclude supreme court review of the underlying issues, whether the district court improperly certified the class.

## I.

 We begin by addressing the effect of the law of the case doctrine on this appeal. Law of the case is a rule of practice that once an issue is considered and adjudicated, that issue should not be reexamined in that court or any lower court throughout the case. *See Sigurdson v. Isanti County*, 448 N.W.2d 62, 66 (Minn. 1989); *L.K. v. Gregg*, 425 N.W.2d 813, 815 (Minn.1988). The rule is not a limitation on the power of a court to reexamine an issue—it is "a rule of practice, not of substantive law." *Braunwarth v. Control Data Corp.*, 483 N.W.2d 476, 476 n. 1 (Minn.1992). While courts have the power to review and overrule their determination on a prior appeal in the same case, they typically do not do so as a matter of policy. *See, e.g., Mattson v. Underwriters at Lloyds of London*, 414 N.W.2d 717, 720 (Minn.1987). There are, of course, exceptions. When there has been a change in the law by a judicial ruling entitled to deference between appeals of the case, law of the case does not typically apply. *Brezinka v. Bystrom Bros., Inc.*, 403 N.W.2d 841, 843 (Minn.1987); *Sands v. Am. Ry. Express Co.*, 159 Minn. 25, 26, 198 N.W. 402, 402 (1924). Similarly, when the evidence on which an appellate court based its prior decision is substantially different on the second appeal, law of the case does

**10.** *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408 (1973).

not preclude reconsideration. *Cayse v. Foley Bros., Inc.,* 260 Minn. 248, 253, 110 N.W.2d 201, 204 (1961).

The law of the case doctrine does not generally bar a higher court from reviewing an earlier decision of a lower court, although other interests such as finality and "encourag[ing] compliance with fair and efficient procedure" may weigh into the court's decision to exercise review. 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478.6 (2d ed.2002); accord *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) ("Just as a district court's adherence to law of the case cannot insulate an issue from appellate review, a court of appeals' adherence to the law of the case cannot insulate an issue from [the U.S. Supreme] Court's review."); *Dobrin v. Dobrin,* 569 N.W.2d 199, 201 (Minn.1997) (acknowledging that the first court of appeals decision was the law of the case following denial of a petition for review and, as such, generally not subject to reexamination on a second appeal to the court of appeals, but nevertheless reviewing and reversing the first court of appeals decision). We therefore hold that even though the court of appeals adhered to the law of the case based on its earlier holding, the law of the case doctrine does not preclude our review of issues decided by the court of appeals in *Peterson I.*

 A separate issue, however, is the appropriateness of reviewing an issue that could have been raised in a prior appeal, but was not. The farmers argue that BASF is barred from challenging class certification and the application of New Jersey law to all the claims in the class because it failed to raise these issues in its petition for review to us following *Peterson I.* Rule 117 of the Minnesota Rules of Civil Appellate Procedure provides that a party seeking review of a decision by the court of appeals may petition the supreme court for discretionary review. The petition shall contain, among other things, "a statement of the legal issues sought to be reviewed, and the disposition of those issues by the Court of Appeals." Minn. R. Civ.App. P. 117, subd. 3(a). In order to facilitate fair and efficient judicial proceedings, matters that are ripe for review should be brought to the court's attention when submitting a petition for review.[11] In *Hoyt Investment Co. v. Bloomington Commerce & Trade Center Associates,* 418 N.W.2d 173 (Minn. 1988), we addressed an appellant's failure to appeal an issue to the supreme court. We noted that the Rules of Civil Appellate Procedure "impose[ ] upon counsel the obligation to state with specificity in their respective briefs the precise nature of the relief sought from the appellate court."

---

11. As Wright, Miller & Cooper put it, in the context of a party failing to argue an issue when an appeal is actually taken:

> There are powerful reasons to insist that all matters ripe for review at the time an appeal is taken be presented for review or abandoned. Part of the price paid for the final-judgment rule is that trial-court proceedings may be tainted by an unappealable ruling and require expensive and time-consuming reconstruction after the opportunity for appeal finally becomes available. There is no reason to pay this price when there was an opportunity for review in the course of an appeal that was actually taken. Even when consideration of the matter on a later appeal would terminate all further proceedings, loss of the opportunity to terminate further proceedings at the time of the earlier appeal exacts a cost. These considerations, however, are a function of efficient relationships between appellate courts and trial courts, not law of the case. The solid explanation is the common explanation of forfeiture—procedural efficiency depends on reliable sanctions.

18B Wright, Miller & Cooper, *supra,* § 4478.6 (footnotes omitted).

*Id.* at 175. "In their petition for further review from the original court of appeals' decision, [the appellants] could have and should have brought the error to [our] attention." *Id.* at 176. When submitting a petition for review, a party should bring issues ripe for review to the supreme court's attention with specificity, or waive the opportunity to have them reviewed.

■ Accordingly, in this case, we must first determine whether BASF's arguments on class certification and choice of law were ripe for review following the court of appeals' decision in *Peterson I.* The procedural background of this case and the nature of class certification may make this case practically unique. The district court certified the nationwide class in part because of the common nature of the claims that could be brought under the NJCFA. The court denied BASF's subsequent motion to decertify the class, but granted BASF's motion for summary judgment in the same order. After the farmers appealed the grant of summary judgment, BASF appealed separately to the court of appeals, specifically challenging the orders granting class certification and denying decertification of the class. BASF argued that class certification was inappropriate because a detailed choice of law analysis was in order using Minnesota's "significant contacts" test, set forth in *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408 (1973), and because different states' consumer protection laws required those laws to be applied wherever Poast and Poast Plus were purchased or applied. The court of appeals affirmed the district court's certification of the class, but did not conduct a choice of law analysis. *Peterson I,* 618 N.W.2d at 826. Following our denial of review, BASF again moved the district court to decertify the class, asserting that it was unconstitutional to apply the NJCFA to all the claims of the

case and that a *Milkovich* choice of law analysis was required. The district court denied that motion.

Based on this procedural history, we conclude that BASF's arguments on class certification, decertification, and choice of law in a nationwide class were ripe for review following the court of appeals' decision in *Peterson I.* BASF specifically filed a notice of review with the court of appeals on class certification and decertification. These issues could have been raised in BASF's petition for review to us following *Peterson I.* BASF argues that the constitutionality and appropriateness of applying the NJCFA are "distinct" issues, which would not have been ripe for review following *Peterson I.* However, BASF has consistently argued the constitutionality of applying the NJCFA and the need to conduct a detailed choice of law analysis in the context of class certification and decertification. These arguments were made to the court of appeals in *Peterson I* and the same arguments were made in BASF's motion to the district court to decertify the class following *Peterson I.* Choice of law and the constitutionality of applying a state's law were underlying issues to BASF's arguments on class certification and decertification.

Moreover, because a determination on class certification is so important to a class action, a determination as to whether a class action can be maintained should be made as soon as practicable. *Cf.* Minn. R. Civ. P. 23.03(a) ("As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."). Class certification and choice of law are legal issues and would have been appropriate on a petition for review following *Peterson I.* For strategic purposes, presumably, BASF chose instead to raise these issues with the district

court in the context of a decertification motion. As a result, we conclude that the district court's decisions to apply New Jersey law to all the claims in this case, as well as BASF's challenge to class certification, were ripe for review by the supreme court following the court of appeals' decision in *Peterson I*.

BASF argues additionally that it raised the application of New Jersey law and class certification in its petition for review following *Peterson I*. We disagree. In its petition for review, BASF raised two issues: whether as a matter of law BASF's actions could have violated the NJCFA and whether as a matter of law there was an ascertainable loss leading to measurable damages, with *Peterson I* "allow[ing] that measure to apply to a nationwide class action." BASF argues that it raised the class certification issue "as it then existed." However, it is clear that BASF was only petitioning us to consider whether BASF's actions violated the NJCFA and on damages issues. In BASF's petition for review following *Peterson I*, it failed to even mention class certification, decertification, or the need for a *Milkovich* analysis, except to say in passing in the very last sentence of its argument in support of petition that "the lower court without discussion imposed its new damages rule on a New Jersey statute and improperly projected the rule onto a nationwide class." We conclude that BASF failed to raise with specificity class certification, decertification, and its choice of law argument to us following *Peterson I*.

Since BASF's petition for review following *Peterson I*, there have not been any significant changes in the law or in the facts of the case that would make review of class certification or decertification any different now than it would have been when BASF first petitioned us for review.[12] BASF argues that the law has changed because the U.S. Supreme Court's recent decision in *State Farm Mutual Insurance Co. v. Campbell* held that it was a violation of due process to award punitive damages in large proportion relative to compensatory damages. 538 U.S. 408, 123 S.Ct. 1513, 1526, 155 L.Ed.2d 585 (2003). However, BASF is incorrect that *State Farm* prohibits the application of the NJCFA to this case. *State Farm* dealt with excessive punitive damages as a violation of due process and had nothing to do with class certification or choice of law in a class action certification.

Based on the unique procedural history of this case, we conclude that consideration of BASF's arguments on class certification and the decision to apply New Jersey law to all the claims in the class in this appeal would undermine principles of fairness and judicial economy. BASF failed to raise these issues when they were ripe for review following *Peterson I*. We therefore hold that BASF waived its opportunity to have these issues considered by us and we will not address them in this appeal.

## II.

◼ We next consider BASF's contention that federal law preempts the farmers' consumer fraud claims. BASF argues that the farmers' claims were preempted (1) because FIFRA and EPA regulations prohibit any claim that Poast and Poast Plus are the same product and (2) because FIFRA's labeling provisions preempt what

---

**12.** Unlike the facts before us in *Ario v. Metropolitan Airports Comm'n*, 367 N.W.2d 509 (Minn.1985), where we held that a denial of class certification was not law of the case because the class was drastically different, nothing in the record here indicates that the class is any different than it was following *Peterson I*; thus, we are not presented with a case of substantial changes to the class.

BASF describes as an attack on the content of the Poast and Poast Plus labels. Preemption is a question of law, which we review de novo. *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 9 (Minn. 2002).

To begin with, we disagree with BASF's first argument—that the claims in this case are preempted because the central foundation of the farmers' claims is the assertion that under state law Poast and Poast Plus are the same product. The farmers' NJCFA claims were based on alleged unconscionable commercial conduct with regard to EPA-authorized uses of the products. Although evidence was presented that Poast and Poast Plus are essentially the same product—for example, evidence showed that Poast and Poast Plus contain the same amount of active ingredient, sethoxydim, per acre—this evidence was presented to illustrate what the farmers alleged was a scheme to exploit the farmers through consumer fraud. The farmers' consumer fraud claim was not based on Poast and Poast Plus being the same product, but rather on BASF violating the NJCFA by making misrepresentations about the products, which included providing as relevant evidence the fact that they contained the same active ingredient and were EPA approved for use on the same crops.

 BASF's second argument, that FIFRA's labeling provisions preempted the farmers' claims, requires us to address FIFRA preemption in more detail. Federal preemption of state law is determined by examining congressional intent. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 137–38, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). When Congress has included an express provision in the statute that provides a reliable indication of congressional intent, there is no need to imply Congress' intent. *Kuiper v. Am. Cyanamid Co.*, 131 F.3d 656, 661–62 (7th Cir.1997). Such a provision is present in FIFRA. *See Kuiper*, 131 F.3d at 661–62. FIFRA expressly provides that a state "may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter." 7 U.S.C. § 136v(a) (2000). Further, a state "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." 7 U.S.C. § 136v(b) (2000).

 It is well established that FIFRA preempts state actions relating to labeling and packaging.[13] *See, e.g., Kuiper*, 131 F.3d at 663 (holding that a products liability action based on off-label misrepresentations, which essentially repeated the information/restrictions found on a herbicide's label, was preempted under FIFRA). Courts have also found that state law claims " 'premised* on inadequate labeling or a failure to warn,' which result[ ] in the imposition of additional or different labeling requirements" are preempted "regard-

**13.** In *Goeb v. Tharaldson*, 615 N.W.2d 800, 817 (Minn.2000), we analyzed the issue of FIFRA preemption with regard to common law tort actions arising out of injuries after exposure to insecticides. We reiterated the finding that courts "uniformly hold that FIFRA preempts claims relating to labeling and packaging of federally-registered pesticides" and therefore held that FIFRA preempted the plaintiffs' claims dealing with "failure to warn" and "inadequate labeling." *Id.* We also addressed plaintiffs' claims of negligent misrepresentation and negligent testing of products, finding that "claims of negligent misrepresentation and negligent testing [were] not preempted by FIFRA." *Id.* at 819. These negligent misrepresentation claims centered around "the EPA registration process." *Id.* at 818. We did not thoroughly evaluate the misrepresentation issue, however, because the plaintiffs in *Goeb* did not petition for review of these claims. *See id.* at 818–19.

less of the guise under which the claim[s][are] presented." *Netland v. Hess & Clark, Inc.*, 284 F.3d 895, 900 (8th Cir. 2002) (holding that a state action based on defective design was preempted because the premise of each claim was the pesticide manufacturer's label) quoting *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 608 (8th Cir.1999); *accord Worm v. Am. Cyanamid Co.*, 5 F.3d 744, 747–48 (4th Cir.1993) (concluding in the context of state law defective design actions that one factor to consider in resolving the preemption issue is whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter the product or label). In *Mortellite v. Novartis Crop Protection, Inc.*, the federal district court for the District of New Jersey recently addressed FIFRA preemption in the context of a NJCFA claim. 278 F.Supp.2d 390 (D.N.J. 2003). In *Mortellite*, blueberry farmers sued the manufacturer of an insecticide for consumer fraud, alleging that false marketing statements in brochures about product safety caused them to use the product in a dangerous manner. *Id.* at 393. The court found that "[w]hen advertising or promotional materials merely repeat information or language contained on the label, claims directed at the advertising necessarily challenge the label itself and are therefore preempted." *Id.* at 401. The court classified the plaintiffs' NJCFA claim as a negligent failure to warn claim and found it to be preempted. *Id.*

▆▆▆ In the matter before us, the farmers argue that their consumer fraud claim is not based on BASF's labels but rather on fraudulent marketing techniques. The court of appeals agreed. It held that "the farmers' claims were based on BASF's misleading statements and omissions as to the EPA-authorized uses of the products, not on the claims that BASF committed fraud in the labeling or packaging." *Peterson II*, 657 N.W.2d at 865. Further, the court of appeals noted that "the farmers here were not asserting that BASF's registration and container labels were false or misleading, * * * [r]ather, the farmers' point was that *even if* BASF's labels were technically accurate, BASF could and did commit consumer fraud by leading farmers to believe that the cheaper Poast Plus could only be used on major crops * * *." *Id.*

We agree with the court of appeals. Although evidence was presented at trial based on statements derived from the Poast and Poast Plus labels, the farmers' claims of unconscionable commercial conduct derived from statements and actions that went beyond the label. For example, the farmers presented evidence that BASF advertised Poast Plus as only "registered" for use on cotton, soybeans, peanuts, and alfalfa, and advertised that Poast was the "only" post-emergent grass herbicide registered for use on minor crops, which a BASF executive candidly admitted was a material omission. Additionally, BASF attempted to prevent word from spreading that Poast Plus was registered for use on minor crops. A BASF sales representative informed authorities that farmers were using Poast Plus on minor crops, BASF had its public relations firm submit a magazine article discussing increased enforcement of fines for failing to follow label recommendations, and BASF told the North Dakota Department of Agriculture that BASF could not add crops on the Poast label to the Poast Plus label because the EPA would require it to do further residue testing, which would cost the company millions of dollars. BASF's alleged unconscionable conduct went beyond the label and the reach of federal law. As an EPA representative stated in correspondence with the North Dakota Commissioner of Agriculture, the "problem appears to

stem from a company marketing decision in which the EPA had no input." This differs from *Mortellite* where the representations made in the brochures complained of "merely repeat[ed] information or language contained on the label." 278 F.Supp.2d at 401; *accord Anderson v. Dow Agrosciences LLC*, 262 F.Supp.2d 1280, 1291 (W.D.Okla.2003) (holding claims based on off-label statements by the representatives of a herbicide manufacturer were not preempted).

Moreover, under the *Worm* analysis, the issue is "whether one could reasonably foresee that the manufacturer, in seeking to avoid liability for the error, would choose to alter the product or label." *Worm*, 5 F.3d at 747–48; *see also Gooch v. E.I. Du Pont de Nemours & Co.*, 40 F.Supp.2d 863, 873 (W.D.Ky.1999) (stating the analysis as "if [a] manufacturer could avoid liability by altering the label, then FIFRA preempts the claim giving rise to that liability."). That is not the case here. BASF argues that it could not have altered the label because it did not seek state registration of Poast Plus for all the crops for which Poast was state registered. But, the "problem," as an EPA representative called it, was BASF's failure to seek state registration for Poast Plus on all the crops, and more to the point for consumer fraud purposes, BASF's repeated, published, and planned misrepresentations about Poast Plus' EPA registration. It was these actions that the farmers allege amounted to consumer fraud. Accordingly, we affirm the court of appeals and hold that the farmers' NJCFA claims were not preempted by FIFRA.

### III.

Lastly, we address BASF's argument that it is entitled to JNOV because the farmers did not establish any actionable conduct, did not prove a sufficient causal nexus between BASF's actions and any injury suffered, and did not prove that the farmers suffered an "ascertainable loss" as required by the NJCFA. *See* N.J. Stat. Ann. 56:8–19. Where the district court has denied a motion for JNOV, we review the issue de novo. *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn. 1998). However, if there is "any competent evidence reasonably tending to sustain the verdict," we do not set the verdict aside. *Id.* On a motion for JNOV, a court must consider whether viewing the evidence in the light most favorable to the nonmoving party, (1) the verdict is manifestly against the entire evidence or (2) whether despite the jury's findings of fact, the moving party is entitled to judgment as a matter of law. *Id.*

### A. Liability

The NJCFA makes illegal "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise * * *." N.J. Stat. Ann. 56:8–2. In general, the NJCFA has three categories of unlawful practices: affirmative acts, knowing omissions, and regulatory violations. *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 647 A.2d 454, 462 (1994). Two of those three categories are relevant to this case—affirmative acts and knowing omissions—and are examples of what the NJCFA defines as "unconscionable" conduct. *Byrne v. Weichert Realtors*, 290 N.J.Super. 126, 675 A.2d 235, 240 (1996). "Unconscionable commercial practice" in this context is "an amorphous concept obviously designed to establish a broad business ethic." *Kugler v. Romain*, 58 N.J. 522, 279 A.2d 640, 651 (1971). "The standard of conduct that the term

'unconscionable' implies is lack of 'good faith, honesty in fact and observance of fair dealing.'" *Cox*, 647 A.2d at 462 (quoting *Romain*, 279 A.2d at 652). Proof of any act or omission as specified by the statute is sufficient to establish unlawful conduct under the NJCFA. *Cox*, 647 A.2d at 462.

■ BASF argues that the evidence presented did not lead to a "connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. 56:8–2. However, evidence was presented that BASF made material misrepresentations in advertisements. Moreover, the *Sugarbeet Grower* magazine article, efforts by BASF's sales representative to have off-label restrictions enforced, and BASF's less than candid responses to inquiries about Poast Plus' EPA registration showed efforts to prevent farmers from learning that Poast Plus was EPA approved for use on the same crops as Poast. Given the "broad business ethic" that the NJCFA is designed to create, *Romain*, 279 A.2d at 651, there was competent evidence reasonably tending to sustain the verdict on liability.

### B. Causation & Ascertainable Loss

BASF also would be entitled to JNOV if the farmers failed to establish that BASF's actions caused an ascertainable loss. *See Cox*, 647 A.2d at 464. To establish a viola-

tion under the NJCFA, a "causal relationship" must exist between the ascertainable loss and the unlawful practice. *Roberts v. Cowgill*, 316 N.J.Super. 33, 719 A.2d 668, 672 (1998). The NJCFA provides that an offense arises "whether or not any person has in fact been misled, deceived or damaged thereby." N.J. Stat. Ann. 56:8–2. Consumer fraud in New Jersey, in contrast with common law fraud, does not require a showing of reliance, merely a "causal relationship."[14] *Cox*, 647 A.2d at 464.

BASF argues that the farmers failed to prove BASF's actions caused an ascertainable loss because they failed to show that either they or other class members were ever aware of BASF's statements about Poast and Poast Plus and because the farmers' theory of causation, which BASF terms the "lost opportunity to boycott" Poast, is unsupportable as a matter of law. In *Peterson I*, the court of appeals held that a causal link between BASF's conduct and an ascertainable loss could be established based either on (1) the farmers' lost opportunity to choose whether to buy Poast or the lower-priced Poast Plus,[15] or (2) the lost opportunity to refuse to buy Poast if they had known that Poast Plus was EPA registered for the same uses as Poast. 618 N.W.2d at 824–25. In *Peterson II*, the court of appeals held that sufficient evidence had been presented at trial

**14.** The jury was given the following instruction on causation:

The basic question for you to resolve is whether the injury Plaintiffs claim are so connected with a violation of the New Jersey Consumer Fraud Act by BASF that you decide it is reasonable that Defendant should be held responsible for the injury.

**15.** The court cited to a Minnesota case, *Sutton v. Viking Oldsmobile Nissan, Inc.*, 611 N.W.2d 60, 65 (Minn.App.2000), as the basis for this "lost opportunity to buy" theory. *Sutton* was later vacated by this court and remanded to

the court of appeals to consider in light of our decision on the Minnesota Consumer Fraud Act in *Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2 (Minn.2001). *Sutton v. Viking Oldsmobile Nissan, Inc.*, 623 N.W.2d 247, 247 (Minn.2001). On remand, the court of appeals held that a genuine issue of material fact existed as to whether Sutton was damaged, neither affirming nor denying its prior reasoning. *Sutton v. Viking Oldsmobile Nissan, Inc.*, No. C2–99–1843, 2001 WL 856250 at *2 (Minn.App.), *rev. denied* (Minn. Oct. 24, 2001).

for a jury to find an ascertainable loss based on the farmers' lost opportunity to refuse to purchase Poast due to BASF's conduct or actions. 657 N.W.2d at 868.

The farmers' theory of causation is based on unconscionable commercial activities resulting in the farmers purchasing Poast, which had a weighted average price differential of approximately $4 per acre more than Poast Plus. In *Varacallo v. Massachusetts Mutual Life Insurance Co.*, the appellate division of the New Jersey Superior Court held that plaintiffs who purchased whole life insurance policies from an insurer met the requirements for class certification where plaintiffs alleged a knowing omission of material information under the NJCFA. 332 N.J.Super. 31, 752 A.2d 807, 817–19 (2000). The court stated that if the plaintiffs succeeded in showing that the insurance company withheld material information in literature with the intent that consumers would rely on it in purchasing an insurance policy, the purchase of the policy by a person who was shown the literature would be sufficient to establish prima facie proof of causation because the NJCFA requires only a causal relationship, not reliance. *Id.* at 817.

Here, named plaintiffs, as representatives of the class of similarly situated farmers, testified that they had seen the allegedly misleading advertisements. The jury could infer from the advertisements and other evidence that but for BASF's unconscionable conduct, farmers in general would have discovered that Poast Plus was EPA registered for use on the same crops as Poast. Under the NJCFA, class members' awareness of advertisements may provide a sufficient causal nexus. *See Va-*

*racallo,* 752 A.2d at 817. The farmers also presented evidence that BASF's sales documents showed that around 1996, when BASF's actions were exposed to the public, sales for Poast in North Dakota, Minnesota, and elsewhere dropped off. Similarly, the farmers provided evidence that the price of Poast decreased around 1996–97. The farmers argued that BASF's actions from 1992 to 1996 made them unaware that Poast Plus was EPA approved for use on the same crops as Poast, and had this been known, pressure would have been placed on BASF to lower the price of Poast to the more competitive market price of Poast Plus. For example, the farmers could have refused to purchase Poast, or states could have issued special local needs registrations pursuant to FIFRA section 24(c) to allow for the use of Poast Plus on minor crops. The jury could infer from the evidence that BASF's actions had a "causal relationship" with the farmers purchasing Poast, which resulted in them suffering a loss.

Furthermore, the farmers' loss was ascertainable. Our review of the evidence presented leads us to conclude that the underlying economic facts of the case were not seriously in dispute. Both sides presented expert testimony on damages. The farmers claimed actual damages of $26,182,501 and the jury awarded the farmers $15,000,000 in actual damages.[16] BASF argued damages by introducing demonstrative trial exhibits and presenting an expert witness who estimated potential liability per acre. BASF's final damage figures varied from the figures presented by the farmers,[17] but once the jury deter-

---

**16.** The jury was instructed on damages and ascertainable loss of money and further that "the price charged is only one factor in your consideration * * *." The jury was also instructed that the damage award would be trebled and reasonable attorney fees would be awarded pursuant to New Jersey law.

**17.** We note, though, that the Director of Coastal Business Area for BASF submitted an affidavit stating that he had reviewed sales

74

mined BASF's liability, the evidence of an ascertainable loss by measurable money damages was clear. *See Cox,* 647 A.2d at 464 (holding an ascertainable loss existed where unlawful practice committed by failing to have periodic inspections in a home repair contract caused unsafe wiring and unattractive cabinets, which loss could be measured by repairing those conditions). The actual damage award was a factual determination by the jury.

We conclude there was competent evidence in the record reasonably tending to sustain the verdict when the evidence is viewed in the light most favorable to the nonmoving party. A judgment in favor of BASF as a matter of law would not be appropriate and the verdict was not manifestly against the weight of the entire evidence of liability, causation, and ascertainable loss. We affirm the court of appeals and hold that BASF is not entitled to JNOV.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.

records for the sale of Poast and Poast Plus for the period 1992–1996 and determined that the weighted average price differential between the two products for that period was approximately $4 per acre. This price differential is close to the price differential used by the farmers' expert, illustrating that the underlying economic facts were not seriously in dispute. BASF's damage expert estimated the farmers' actual damage at $7,251,417.